**ORIGINAL**

CLERK OF DISTRICT COURT
NORTHERN DISTRICT OF TX
FORT WORTH DIVISION
FILED

2023 JUN -5 PM 1: 20

DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

Case No. **4-23CV-556-Y**

### JOHN ANTHONY CASTRO
12 Park Place, Mansfield, TX 76063
202-594-4344

*Plaintiff,*

*v.*

### DONALD J. TRUMP, CHARLES RETTIG, MARIA CHAPA LOPEZ, TUAN MA, ANNE CRAIG-PENA, ANTON PUKHALENKO, ESTELA WELLS, JOHN TURNICKY, AND OTHER UNNAMMED CO-CONSPIRATORS

*Defendants.*

## VERIFIED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

JOHN ANTHONY CASTRO
12 Park Place
Mansfield, TX 76063
Tel. (202) 792- 6600
J.Castro@JohnCastro.com

**PLAINTIFF *PRO SE***

# Table of Contents

Table of Authorities ...................................................................................................... iii

VERIFIED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF ........................ 1

I.   PARTIES ......................................................................................................... 2

II.  JURISDICTION ............................................................................................... 3

III. VENUE ............................................................................................................ 4

IV.  FACTUAL BACKGROUND ............................................................................. 4

A.   Background of John Anthony Castro ................................................................ 6

B.   John Anthony Castro Joins the Anti-Trump Republicans in the Lead-Up to the 2020 General Election .......................................................................................................... 8

C.   Historical Background of John Anthony Castro's Disputes with the Trump White House, the IRS, and Intelligence Agencies at JDFPG ............................................................... 9

D.   The Genesis of the Central Florida Conspiracy ............................................. 11

E.   The IRS Inexplicably Suspends and Then Reinstates John Anthony Castro's Enrolled Agent Credentials .......................................................................................................... 12

F.   John Anthony Castro Begins Investigating the IRS with FOIA ....................... 15

G.   John Anthony Castro Learns of the Investigation Before the 2020 Election ................... 16

H.   Castro Files Suit Targeting IRS-CI Special Agent Tuan Ma's Criminal Conduct ........... 20

I.   The IRS Unlawfully Retaliates in the Middle of Litigation by Revoking Castro's Electronic Filing Identification Number (EFIN) ........................................................... 24

J.   DOJ Orders IRS to Reinstate Castro's EFIN ................................................. 24

V.   Legal Background ........................................................................................... 25

A.   The Prohibition of Weaponizing the IRS ........................................................ 25

B.   The Fourth Amendment and the Right to Privacy ........................................... 26

C.   BIVENS CLAIM ............................................................................................. 30

    i.   Background ............................................................................................. 30

    ii.  Damages under Bivens ............................................................................ 32

    iii. Bivens Claims Today .............................................................................. 32

D.   IRS Employee Oversight ................................................................................ 34

E.   DOJ Grievance Process .................................................................................. 35

VI.  DEMAND FOR JURY TRIAL ........................................................................ 36

VII. CONSTITUTIONAL COUNTS ....................................................................... 36

COUNT I ................................................................................................................... 36

Bivens Claim against Defendant ............................................................................... 36

COUNT II ............................................................................................................ 37

Unlawful Search and Seizure – Microsoft Subpoena ...................................................... 37

COUNT III ........................................................................................................... 38

Unlawful Search and Seizure – SmartVault Subpoena.................................................... 38

COUNT VI ........................................................................................................... 38

Unlawful Search and Seizure – Wolter Kuwler Subpoena ............................................... 38

Verification ......................................................................................................... 40

## Table of Authorities

**Cases**

Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,
   403 U.S. 388 (1971) .................................................................................................... passim

Butz v. Economou,
   438 U.S. 478 (1978) .................................................................................................... 30, 31

Carlson v. Green,
   446 U.S. 14 (1980) ...................................................................................................... 30, 31

Carpenter v. United States,
   138 S. Ct. 2206 (2018) ............................................................................................ 26, 27, 28

Castro v. IRS,
   No. CV 20-1843 (D.D.C. Mar. 22, 2022) .................................................................. 12, 16

Castro v. Trump,
   Case No. 9:23-cv-80015 (S.D. Fla. Jan. 6, 2023) ............................................................ 7

Davis v. Passman,
   442 U.S. 228 (1979) ............................................................................................................ 30

Egbert v. Boule,
   142 S. Ct. 1793 (2022) ....................................................................................................... 33

Hernandez v. Mesa,
   140 S. Ct. 735 (2020) ......................................................................................................... 33

Humana, Inc. v. Avram A. Jacobson, M.D., P.A.,
   804 F.2d 1390 (5th Cir. 1986) .......................................................................................... 30

In re Silver,
   540 S.W.3d 530 (Tex. 2018) .............................................................................................. 12

In re U.S. for Hist. Cell Site Data,
   724 F.3d 600 (5th Cir. 2013) ...................................................................................... 28, 29

Katz v. United States,
   389 U.S. 347 (1967) ............................................................................................................ 26

Smith v. Maryland,
   44 U.S. 735 (1979) ....................................................................................................... 26, 27

Sperry v. Florida,
373 U.S. 379 (1963) ................................................................................ 6

United States v. Forrester,
512 F.3d 500 (9th Cir. 2008) .................................................................. 29

United States v. Hammond,
858 F2d 834 (2d Cir. 1988 ...................................................................... 35

United States v. R. Enterprises, Inc.,
498 U.S. 292 (1991) ................................................................................ 34

United States v. Warshak,
631 F.3d 266 (6th Cir. 2010) .................................................................. 28

Ziglar v. Abbasi,
137 S. Ct. 1843 (2017) ................................................................. 29, 32, 33

**Statutes**

26 U.S.C. § 6011(e)(3) .............................................................................. 22
26 U.S.C. § 6103 .......................................................................... 9, 16, 19, 21
26 U.S.C. § 6103(b) .................................................................................. 21
26 U.S.C. § 7217 .................................................................................... 2, 24
26 U.S.C. § 7217(a) .................................................................................. 24
26 U.S.C. § 7217(d) .................................................................................. 24
26 U.S.C. § 7217(e) .................................................................................. 24
26 U.S.C. § 7341 ...................................................................................... 19
26 U.S.C. § 7602(d) .................................................................................. 20
26 U.S.C. § 7604 ...................................................................................... 20
26 U.S.C. § 7801 ...................................................................................... 32
26 U.S.C. § 7802 ...................................................................................... 32
26 U.S.C. § 7802(c)(2)(B) ......................................................................... 32
28 U.S.C. § 1331 ........................................................................................ 2
28 U.S.C. § 1391(b) .................................................................................... 3
28 U.S.C. § 2201(a) .................................................................................... 2
5 U.S.C. §§ 701-706 ................................................................................... 2

**Other Authorities**

Electronic Communications Privacy Act ...................................................... 3
IRS Restructuring and Reform Act of 1998, Pub. L. 105-206 ..................... 10

**Rules**

Fed. R. Civ. P. 38(b) ................................................................................ 34
Fed. R. Civ. P. 5.1 ..................................................................................... 3

## Constitutional Provisions

First Amendment ................................................................................................................. 3
Fourth Amendment ...................................................................................................... passim
Fourtheenth Amendment ............................................................................................. 7, 18

## Secondary Sources

Leslie S. Garthwaite, An End to Politically Motivated Audits of Churches? How Amendment to
    Section 7217 Can Preserve Integrity in the Tax Investigation of Churches Under Section 7611,
    60 Tax Law. 503 (2007)............................................................................................ 24

## Internal Revenue Manual

IRM 13.1.15 ....................................................................................................................... 11
IRM 9.5.11.2.4 ................................................................................................................... 24

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

Case No.

| | | |
|---|---|---|
| JOHN ANTHONY CASTRO<br>12 Park Place, Mansfield, TX 76063<br>202-594-4344<br>    Plaintiff,<br><br>*v.*<br><br>DONALD J. TRUMP, CHARLES RETTIG,<br>MARIA CHAPA LOPEZ, TUAN MA, ANNE<br>CRAIG-PENA, ANTON PUKHALENKO,<br>ESTELA WELLS, JOHN TURNICKY, AND<br>OTHER UNNAMMED CO-CONSPIRATORS | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | JURY TRIAL DEMANDED |

## VERIFIED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Plaintiff, John Anthony Castro, *pro se,* brings this suit against Donald J. Trump, Charles Rettig, Tuan Dang Ma, Anne Craig-Pena, Anton Pukhalenko, Estela Wells, John Turnicky, and other unnamed co-conspirators for the violation of John Anthony Castro's constitutionally protected right to privacy, freedom of speech, and to be free from unreasonable search and seizure under the Fourth Amendment to the United States Constitution as a direct and proximate result of the negligent, reckless, intentional, and criminal political retaliatory acts committed by Defendants.

To put it plainly, former President Donald J. Trump weaponized fanatical supporters who worked within the Internal Revenue Service and U.S. intelligence community to unlawfully monitor, surveil, and harass John Anthony Castro knowing his involvement with like-minded Republicans opposed to Trump's toxic political rhetoric. During his Presidency and even prior to leaving office, former President Donald J. Trump, in a joint conspiracy with the named and

unnamed Defendants, authorized an unlawful surveillance program targeting John Anthony Castro and other individuals that former President Donald J. Trump deemed to be his political enemies. The goal of this unauthorized surveillance program was to find evidence of criminal wrongdoing in order to discredit John Anthony Castro.  The program ultimately failed because John Anthony Castro is a law-abiding citizen.

John Anthony Castro is now seeking the Republican nomination for the Presidency of the United States and has a personal lawsuit against Donald J. Trump before the U.S. District Court for the Southern District of Florida wherein he seeks a declaratory judgment that Mr. Trump is disqualified from seeking or holding public office pursuant to Section 3 of the 14th Amendment for giving aid or comfort to the insurrectionists that violently attacked the United State Capitol on January 6, 2021.

John Anthony Castro seeks compensatory and punitive damages against in the amount of $180,125,545. John Anthony Castro further demands a TRIAL BY JURY.  In support of this complaint, John Anthony Castro respectfully states, alleges, and prays as follows:

## I.   **PARTIES**

1.     Plaintiff John Anthony Castro is a 2024 candidate for the Republican nomination for the Presidency of the United States, a U.S. citizen and resident of the city of Mansfield, county of Tarrant, state of Texas.

2.     Defendant Donald J. Trump is the former President of the United States, a 2024 candidate for the Republican nomination for the Presidency of the United States, a U.S. citizen and resident of the city of Palm Beach, county of Palm Beach, state of Florida.

3.     Defendant Charles Rettig is the former Trump-appointed Commissioner of Internal Revenue, a U.S. citizen and resident of the city of Encino, county of Los Angeles, state of California.

2

4.    Defendant Maria Chapa Lopez is the former Trump-appointed U.S. Attorney for the Middle District of Florida and a U.S. citizen. Her residency is unknown at this time.

5.    Defendant Tuan Dang Ma is a Trump-supporting IRS-CI Special Agent, a U.S. citizen and resident of the city of Orlando, county of Orange, state of Florida.

6.    Defendant Anne Craig-Pena is a Trump-supporting IRS Attorney with the Office of Chief Counsel, a U.S. citizen and resident of the city of Lakewood, county of Jefferson, state of Colorado.

7.    Defendant Anton Pukhalenko is a Trump-supporting Tax Examiner with the Internal Revenue Service, a U.S. citizen and resident of the city of Tampa, county of Hillsborough, state of Florida.

8.    Defendant Estela Wells is a Trump-supporting Tax Examiner with the Internal Revenue Service, a U.S. citizen and resident of the city of Tampa, county of Hillsborough, state of Florida.

9.    Defendant John Turnicky is the former Head of Security for the Central Intelligence Agency and current Housing Program Manager for the U.S. Department of Defense at the Joint Defense Facility at Pine Gap ("JDFPG").

10.    Defendants John Doe assisted in the conspiracy to unlawfully surveil, harass, and retaliate against Plaintiff.

## II.    JURISDICTION

11.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

12.    This cause of action arises under 28 U.S.C. § 2201(a), 5 U.S.C. §§ 701-706, the First Amendment for retaliation, and directly under the Fourth Amendment to the U.S. Constitution pursuant to the U.S. Supreme Court ruling in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

### III.   VENUE

13.   Venue is proper under 28 U.S.C. § 1391(b), as a substantial part of the events or omission giving rise to this action occurred in this District.

### IV.   FACTUAL BACKGROUND

14.   John Anthony Castro has a reasonable expectation of privacy in his business email account even if the age of the email is greater than 180 days.  Reasonable expectation of privacy is a mixed question of fact and law that the Electronic Communications Privacy Act cannot dictate.[1]

15.   His reasonable expectation of privacy was eroded when then-President Donald J. Trump took notice of John Anthony Castro's political endeavors and abused his power to order government actors to harass and infringe on John Anthony Castro's rights.

16.   Former President Donald J. Trump did not act alone; he leveraged the Office of the President of the United States to have others within the federal government do his bidding. Most notably, he directed the Commissioner of Internal Revenue Charles Rettig to act as his political chess piece in order to weaponize the IRS.

17.   The unlawful behavior, directed and perpetrated by the former President Donald J. Trump, through the former Commissioner of Internal Revenue Charles Rettig, includes requesting multiple subpoenas on fraudulent grounds, violating John Anthony Castro's taxpayer privacy rights, and revoking his ability to file U.S. tax returns electronically, which the U.S.

---

[1] Pursuant to Fed. R. Civ. P. 5.1., John Anthony Castro includes herein a Notice of Constitutional Question and will "serve the notice and paper on the Attorney General of the United States" by certified mail or "an electronic address designated by the attorney general for this purpose."  According to Brian Hudak, Chief of the Civil Division of the U.S. Attorney's Office for the District of Columbia, the email address for purposes of this rule is: USADC.ServiceCivil@usdoj.gov

Department of Justice compelled the IRS to reverse once John Anthony Castro sought emergency review before the U.S. Court of Appeals for the Fifth Circuit.

18.    Despite a U.S. Supreme Court ruling mandating probable cause to obtain emails, U.S. government agents, at the direction of former President Donald J. Trump and former Commissioner of Internal Revenue Charles Rettig, either provided false information in the probable cause affidavit or entirely failed to provide a probable cause affidavit in order to subpoena the privileged emails of Plaintiff John Anthony Castro. More importantly, the U.S. Government failed to employ the use of a privilege screening team upon receiving said privileged emails.

19.    Former President Donald J. Trump's weaponization of the IRS runs deep. After he unlawfully directed former Commissioner of Internal Revenue Charles Rettig to target John Anthony Castro, former Commissioner of Internal Revenue Charles Rettig identified two IRS Agents, IRC-CI Special Agent-in-Charge Bryan Pane and rookie IRS-CI Special Agent Tuan Ma, who are outspoken supporters of former President Donald J. Trump, to be the boots on the ground for this unlawful undertaking.

20.    As result, IRS-CI Agent Bryan Pane and Tuan Ma approached employees, a former contractor, and clients of John Anthony Castro to conduct a fishing expedition and attempt to taint his reputation by disclosing his confidential tax information to countless individuals.

21.    But former President Donald J. Trump did not stop there. Directly and through an intermediary, former President Donald J. Trump approached John Turnicky, former Head of Security at the Central Intelligence Agency and current Housing Program Manager for the U.S. Department of Defense at JDFPG, Jason Lang, the Head of Security at JDFPG, and other unnamed individuals employed at JDFPG to continue his political harassment of John Anthony Castro. Former President Donald J. Trump strategically sought out these named and unnamed individuals

because John Anthony Castro had previously reported their criminal wrongdoings to the D.C. U.S. Attorney's Chief of Fraud and Public Corruption, J.P. Cooney.

22.     Between August 2018 and February 2023, John Turnicky, Jason Long, and other unnamed individuals employed at JDFPG abused their access to government spying systems to engage in the unauthorized electronic surveillance of John Anthony Castro.

23.     The rouge, unsanctioned, and unauthorized electronic surveillance program of John Anthony Castro was initially utilized to monitor John Anthony Castro's communications with JDFPG employees regarding their tax matters with John Anthony Castro in his capacity as an International Tax Attorney.  However, the unlawful surveillance program was then expanded to monitor John Anthony Castro's communications with non-JDFPG clients, personal communications, cell phone calls, text messages, home internet activity, and home internet cameras.

24.     Because of former President Donald J. Trump's direction and efforts to seize John Anthony Castro's client communication, countless taxpayers' information are potentially in the hands of the U.S. Government in violation of the 4th Amendment.

25.     Backed by then-President Trump, John Turnicky and the unnamed individuals currently or previously employed at JDFPG then began to coordinate with IRS Criminal Investigation to initiate a direct referral to the U.S. Department of Justice (DOJ).

26.     The following is a chronological factual account that shows how John Anthony Castro was unlawfully targeted, surveilled, and harassed by agents of the U.S. Government for speaking out against former President Donald J. Trump.

**A. Background of John Anthony Castro**

27.     John Anthony Castro is a graduate of Georgetown University Law Center where he earned his Master of Laws (LL.M.) in Taxation with a Certificate in International Taxation, the

University of New Mexico School of Law where he earned his Juris Doctor (J.D.), and Harvard Business School where he completed the Owner and President Management (OPM) Program, which is the only executive education program that grants full alumni status upon completion.

28.   John Anthony Castro is authorized to limitedly practice tax law before the IRS. His Preparer Tax Identification Number is 01697079.  This alone provides status as a federal practitioner whereby John Anthony Castro may speak on behalf of or otherwise represent taxpayers before the IRS.  Because these activities are authorized under federal law, state bars do not have the authority to regulate John Anthony Castro pursuant to the Supremacy Clause as explained by the U.S. Supreme Court in *Sperry v. Florida*, 373 U.S. 379 (1963).

29.   Because federal law permits John Anthony Castro to limitedly represent taxpayers before the IRS and he has two law degrees, John Anthony Castro has and will continue to hold himself out to the public as an International Tax Attorney.  If any state bar disagrees with this position, they may seek an injunction to prevent John Anthony Castro from doing so. However, to date, no state bar has been willing to challenge the U.S. Supreme Court's ruling in *Sperry v. Florida* as it applies to federal tax practitioners like John Anthony Castro.

30.   John Anthony Castro has been published in Tax Analysts and the Nevada Law Journal and has a book titled *International Taxation in Plain English* that was previously used as a textbook at the University of Maryland's R.H. Smith School of Business.

31.   John Anthony Castro's international tax blog has been listed as an authoritative source by New York University ("NYU") Law Library's website.

32.   John Anthony Castro's legal ingenuity has been covered by Forbes, Entrepreneur, the International Business Times, SMSF Advisor, and the Sydney Morning Herald.

33.   John Anthony Castro's political activities have been covered by Newsweek, the Washington Post, Politico, Texas Tribune, Dallas Morning News, Fort-Worth Star Telegram, Epoch Times, and the Daily Kos.

34.   John Anthony Castro is currently a Republican Presidential Candidate for the 2024 election and currently has an active federal lawsuit directly against former President Donald J. Trump to challenge his eligibility to pursue public office under Section 3 of the 14th Amendment for having given aid or comfort to the January 6th Insurrectionists that attacked the United States Capitol in an attempt to unlawfully prevent the peaceful transition of power to then President-elect Joseph R. Biden.  See *Castro v. Trump*, Case No. 9:23-cv-80015 (S.D. Fla. Jan. 6, 2023).

35.   John Anthony Castro has secured two patents from the United States Patent and Trademark Office covering "Tax Planning Using Video-Based Graphical User Interface and Artificial Intelligence," which has received a formal valuation of $180 million.

**B. John Anthony Castro Joins the Anti-Trump Republicans in the Lead-Up to the 2020 General Election**

36.   In 2017, John Anthony Castro joined the efforts of the Lincoln Project and other like-minded Republicans who were concerned with the long-term damage that the rhetoric of then President Donald J. Trump would inflict on the Republican Party.

37.   In 2020, John Anthony Castro spent considerable sums on political advertising efforts in swing counties in Michigan, Wisconsin, and Pennsylvania, which John Anthony Castro had determined were critical to the effort to defeat then President Donald J. Trump in the 2020 General Election.

38.   Former President Donald J. Trump was briefed by political advisors on John Anthony Castro's efforts.

**C. Historical Background of John Anthony Castro's Disputes with the Trump White House, the IRS, and Intelligence Agencies at JDFPG**

39.   On August 15, 2017, a potential client contacted John Anthony Castro's firm, Castro & Co., regarding an international tax issue arising in Alice Springs, Northern Territory, Australia, at JDFPG.

40.   At first, John Anthony Castro believed that the tax dispute is a standard dispute with regard to interpreting the U.S.-Australia Income Tax Treaty. However, shortly after the initial contact, John Anthony Castro began receiving information from employees at JDFPG that their signatures were forged on IRS Closing Agreements, and one person claimed that their private taxpayer information was unlawfully leaked to the Australian Tax Office.

41.   John Anthony Castro identified the likely culprit as IRS Competent Authority Analyst Melanie Godelis ("IRS Agent Melanie Godelis"), who worked with the IRS's Large Business and International ("LB&I") Division.

42.   On or around this time, John Anthony Castro became heavily involved in the political effort to defeat Republican Senatorial Candidate Roy Moore in Alabama, which was successful, as part of an internet-based group led by John Anthony Castro that identified themselves online as "The Resistance." At the time of the special election, John Anthony Castro was vacationing in Costa Rica. Upon returning to the United States, John Anthony Castro was detained at the airport for nearly an hour without explanation. John Anthony Castro overheard an employee mention that they were awaiting a call from McLean, Virginia. This was the first indication that John Anthony Castro's political activities were being noticed by those in or near Washington, DC.

43.   On or about February 15, 2018, John Anthony Castro learned that IRS Agent Melanie Godelis was requesting retroactive consent from employees at JDFPG to disclose

9

confidential taxpayer information that she had already allegedly leaked to the Australian Tax Office in coordination with Defendant John Turnicky. This appeared to John Anthony Castro to be an illegal cover-up in the works; trying to extort consent to disclose confidential taxpayer information after already having had leaked it to a foreign government. That is the legal equivalent of asking a bank for a retroactive invitation after breaking into the vault the night before.

44.    On February 21, 2018, John Anthony Castro emailed IRS Agent Melanie Godelis and an employee of Northrop Grumman named Chris Boyer, warning them that their actions were getting dangerously close to violating, if not already violating, taxpayer confidentiality laws under 26 U.S.C. § 6103. In the ensuing months, the conduct did not appear to stop. Therefore, John Anthony Castro reached out to the U.S. Attorney's Office in Washington DC.

45.    On or about August 15, 2018, John Anthony Castro met with the U.S. Attorney of Washington DC's Chief of Fraud and Public Corruption, J.P. Cooney, to provide all of the evidence and allegations John Anthony Castro had regarding IRS Agent Melanie Godelis.

46.    John Anthony Castro was told the case was forwarded to the Treasury Inspector General for Tax Administration ("TIGTA"). John Anthony Castro was later contacted by a special agent with TIGTA on or around October 2018. John Anthony Castro expected to receive an update about holding IRS Agent Melanie Godelis accountable for leaking confidential taxpayer information to a foreign government. Instead, TIGTA sternly warned John Anthony Castro in a threatening tone to stop even mentioning IRS Agent Melanie Godelis' name in public and to cease any accusations. It was quite clear to John Anthony Castro that TIGTA was more interested in concealing the criminality of IRS employees than holding them accountable.

**D.  The Genesis of the Central Florida Conspiracy**

47.    In another matter, John Anthony Castro represented a different client regarding his surrender of his U.S. lawful permanent residence status, commonly referred to as the green card.  IRS Agent Estela I. Wells ("IRS Agent Wells"), based out of central Florida, was assigned to the case.  Although John Anthony Castro satisfied Treasury regulations with regard to the manner by which a taxpayer must surrender his green card in order for the surrender to be legally recognized by the IRS, IRS Agent Wells unjustifiably demanded additional documentation in contravention of established regulations and in violation of the Administrative Procedures Act. When John Anthony Castro asked for the legal justification for additional documentation beyond that required by regulations, John Anthony Castro did not receive an adequately coherent reply.  It became apparent to John Anthony Castro that the demand for additional documentation was purely harassment ordered by Commissioner of Internal Revenue Charles P. Rettig.   The IRS was breaking their own rules to win by any means necessary.

48.    On April 13, 2019, John Anthony Castro sent IRS Agent Wells an email explaining that the IRS Restructuring and Reform Act of 1998, Pub. L. 105-206, Title I, Section 1203(a), states that the Commissioner "shall terminate the employment of any employee" that, pursuant to Section 1203(b)(6), violates "Department of Treasury regulations... for the purpose of retaliating against, or harassing, a taxpayer, taxpayer representative, or other."

49.    On August 6, 2019, another client for whom there was an ongoing tax examination informed John Anthony Castro that IRS Agent Wells had taken over the examination. That examination was previously being handled by Internal Revenue Agent Denise Stinson (IRS Agent Stinson), also based out of central Florida. IRS Agent Stinson provided no explanation as to why she was being replaced in the examination, especially with someone who John Anthony

Castro had recently warned about noncompliance with established Treasury regulations that could result in that agent's termination. It was quite clear IRS Agent Wells was taking over the case to continue her campaign of retaliation and harassment against John Anthony Castro and his clients.

50. In yet another matter, John Anthony Castro was involved in another client's tax examination with IRS Revenue Agent Anton Pukhalenko (IRS Agent Pukhalenko), also based out of central Florida. During the course of the examination, John Anthony Castro and his client became concerned that IRS Agent Pukhalenko unlawfully backdated an Information Document Request in order to meet the statute of limitations on assessing taxation for a particular tax year.

51. On May 31, 2019, John Anthony Castro sent IRS Agent Pukhalenko a letter accusing him of backdating documents and included therein a formal "Section 1203 Complaint" in accordance with Internal Revenue Manual ("IRM") 13.1.15.

### E. The IRS Inexplicably Suspends and Then Reinstates John Anthony Castro's Enrolled Agent Credentials

52. On May 10, 2019, unbeknownst to John Anthony Castro, Microsoft had responded to a subpoena issued by Assistant U.S. Attorney Chauncey Bratt. *See* ¶ 79, intra. Unbeknownst to both Microsoft, IRS-CI Special Agent Tuan Ma had pushed for the acquisition of the subpoena through deception in coordination with IRS-CI Special Agent-in-Charge Bryan Payne who was acting on behalf of former IRS Commissioner Charles Rettig who was coordinating these efforts with Trump-appointed U.S. Attorney Maria Chapa Lopez.

53. In order to secure the subpoena, IRS Special Agent Tuan Dang Ma knowingly failed to disclose to the U.S. District Court for the Middle District of Florida that the emails being sought were protected by the Texas Attorney-Client Privilege. *See In re Silver*, 540 S.W.3d 530 (Tex. 2018). Even after receiving the emails and seeing that each email contained a notice that the email was privileged, Tuan Dang Ma knowingly failed to notify anyone.

54.     On or about June 28, 2019, during the course of actively representing a separate client for a tax examination, Internal Revenue Agent Charles Arrowood (IRS Agent Arrowood), also based out of central Florida, informed John Anthony Castro that there was an "issue" with his Enrolled Agent ("EA") license and that John Anthony Castro needed to call "Tony Woods" (IRS Agent Woods) with the "Office of Professional Responsibility."

55.     On or about June 28, 2019, John Anthony Castro called and spoke with IRS Agent Woods. John Anthony Castro recalled her holding herself out as being with the IRS Office of Professional Responsibility.  This is critical because John Anthony Castro later learned in a FOIA lawsuit before the United States District Court of the District of Columbia that this was false. *See Castro v. IRS*, No. CV 20-1843 (D.D.C. Mar. 22, 2022).

56.     As a result of the FOIA civil action, the IRS confessed that IRS Agent Wood was a Management and Program Analyst with the Large Business and International Division of the IRS.  This was only after an email revealed that IRS Agent Wood initially falsely claimed to the FOIA Manager that she had no emails or documents responsive to John Anthony Castro's FOIA request.  Moreover, the IRS redacted the Call Log List that John Anthony Castro received in the FOIA case.  It did, however, list a call on June 26, 2019, but it identifies the IRS employee with whom John Anthony Castro allegedly spoke to as Carol Terrell, who is purportedly an IRS Investigative Assistant.

57.     On the June 28 2019, call, the individual who identified herself as IRS Agent Woods, whether it was the real IRS Agent Wood or Carol Terrell falsely identifying herself as IRS Agent Wood, informed John Anthony Castro that his Enrolled Agent license was not suspended but that he needed to send her evidence of completed continuing education hours for the 2014 - 2016 period to justify John Anthony Castro's renewal of his Enrolled Agent license for the 2017 -

13

2019 period, which had already been approved back in 2017. John Anthony Castro was told to also include his continuing education hours for the 2017 - 2019 period if he wanted to reactivate his status with the IRS going into 2020. John Anthony Castro was told to fax all of the information to (855) 889-7959. John Anthony Castro recalled finding it ludicrous that it was June 2019, and he was being asked to locate documentation going back to January 2014.

58.     On or about September 18, 2019, John Anthony Castro was instructed by the IRS to submit Form 8554 to renew his Enrolled Agent status. John Anthony Castro was instructed to enter the last business day of the period to which the renewal applied, which was "December 30, 2016" under the penalty of perjury line. John Anthony Castro found this instruction to be extremely suspicious and, perhaps, an attempt to lure him into violating the law by misrepresenting the date the application was being submitted, so John Anthony Castro entered the actual date above it, which was October 16, 2019. Coincidentally, this is the Call Log Listing that was redacted in the FOIA case preventing John Anthony Castro from learning the identity of the IRS employee who provided John Anthony Castro with misleading instructions in an attempt to induce John Anthony Castro into providing false information, which would have been a prosecutable criminal offense. *See* ¶ 56, *intra*. It was an attempted set-up. The IRS was trying to manufacture a crime to frame John Anthony Castro for an indictment at the order of then-President Donald J. Trump who had identified John Anthony Castro as a political enemy. Had John Anthony Castro not written the true date above the date he was instructed to write; he would have found himself indicted for unlawfully backdating a document.

59.     John Anthony Castro became concerned that the IRS employees with whom he was speaking about his Enrolled Agent status were, in fact, employees of the IRS's LB&I as well as the employees against whom he had either warned of or filed complaints against. John Anthony

Castro was concerned these employees were not IRS employees who routinely deal with administrative matters, such as Enrolled Agent licensing, payment of annual fees, and confirming continuing education requirements.

60.    After a few conversations, John Anthony Castro was informed by IRS Employee Tisha Summers that his Enrolled Agent status had been inexplicably and unjustifiably suspended by the IRS. The IRS falsely claims to have sent John Anthony Castro a notification on July 12, 2017, on IRS Form 4321-C. The IRS has neither provided a copy of that letter nor confirmed to what address it was sent. John Anthony Castro was never made aware that his Enrolled Agent status had changed. Only later, during the aforementioned conversations with IRS personnel, did John Anthony Castro become aware of the situation.

61.    In fact, throughout calendar years 2017 and 2018, the online IRS search tool confirmed that John Anthony Castro's Enrolled Agent status was active, and John Anthony Castro provided that internet link to clients to substantiate his licensing. In other words, someone at the central Florida IRS office decided to unilaterally initiate an unjustified investigation into John Anthony Castro's license in an effort to harass and retaliate against him.

**F. John Anthony Castro Begins Investigating the IRS with FOIA**

62.    In early January 2020, John Anthony Castro began researching the possible use of FOIA to explore its possible use to shine light on these events of why his Enrolled Agent license was still inactive. This legal research was done on his home computer.

63.    Coincidentally, on January 31, 2020, the IRS unexpectedly reinstated his Enrolled Agent license. No explanation was provided. The IRS did not respond to phone calls seeking clarification. John Anthony Castro became concerned that his internet research activity was being monitored.

64.    As a result of this concern, John Anthony Castro invested heavily in additional IT security.  Unbeknownst to John Anthony Castro at the time, his concerns that he was being unlawfully surveilled were accurate.  Defendants' reckless and unauthorized violations of John Anthony Castro's privacy resulted in John Anthony Castro unnecessarily $125,545.17 in additional IT security.

65.    On or about February 13, 2020, John Anthony Castro became concerned that the IRS's treatment was retaliation and thus decided to request records under FOIA to learn more about why his Enrolled Agent license had been inexplicably revoked.

66.    On or around this time, John Anthony Castro announced his candidacy for the Republican Nomination for the United States Senate in his home state of Texas to challenge Senator John Cornyn.

67.    On July 8, 2020, John Anthony Castro filed a civil action under FOIA in the United States District Court of the District of Columbia.  *See Castro v. IRS*, No. CV 20-1843 (D.D.C. Mar. 22, 2022).

**G.  John Anthony Castro Learns of the Investigation Before the 2020 Election**

68.    On October 30, 2020, four days before the Presidential election, John Anthony Castro was informed by his alma mater, Georgetown University, that they had received a grand jury subpoena for his education records.

69.    Then-President Donald J. Trump ordered U.S. Attorney Maria Chapa Lopez to issue the subpoena without the standard and typical gag order with the knowledge that by doing so, Georgetown University would notify John Anthony Castro of the subpoena.  Trump wanted John Anthony Castro to know about the investigation so that he would cease his political attacks.

70.   The subpoena was authorized by Trump-appointed U.S. Attorney Maria Chapa Lopez.  The Assistant U.S. Attorney listed was Chauncey A. Bratt.  The subpoena was dated September 9, 2020.

71.   The subpoena avoided scrutiny by Assistant U.S. Attorney Chauncey Bratt because he had placed his trust in IRS-CI Special Agent Tuan Ma to conduct a lawful investigation. But IRS-CI Special Agent Tuan Ma abused that trust by issuing a subpoena to Georgetown Law for John Anthony Castro's education records with no valid investigatory purpose and with the sole purpose of harassing John Anthony Castro at the instruction of IRS-CI Special Agent-in-Charge Bryan Payne as he had done for the past four years during the course of this reckless and grossly mishandled investigation.

72.   By issuing sham subpoenas, IRS-CI Special Agent Tuan Ma manipulated the DOJ to engage in fishing expeditions and harassment of John Anthony Castro.

73.   The subpoena number was 2018R01689027 suggesting that the grand jury assigned to this investigation was empaneled in 2018; shortly after John Anthony Castro's meeting with the DC U.S. Attorney's Chief of Fraud and Public Corruption, J.P. Cooney, to report criminal wrongdoing by the IRS. Assistant U.S. Attorney Chauncey Bratt later denied ever having presented anything before an actual grand jury; an assertion contradicted by the subpoena number.

74.   In the following days, John Anthony Castro immediately assembled a legal team led by the former Chief of the Internal Revenue Service's Criminal Investigation (CI) Division, Don Fort of Kostelanetz & Fink LLP in New York and others.

75.   All throughout the remainder of 2020 and all of 2021, believing the Department of Justice (DOJ) inquiry was being made in good-faith, John Anthony Castro conducted a thorough

internal review of all tax returns prepared and submitted by his firm, Castro & Co., attempting to decipher what could lead the DOJ to have suspicion that a crime was committed.

76.    Simultaneously, in February 2021, John Anthony Castro launched a bid for a U.S. House seat vacated by a congressman who passed away as a result of COVID complications.

77.    On April 13, 2021, one of John Anthony Castro's clients, Christiaan Dekter, informed John Anthony Castro that two IRS agents showed up to his house in California with questions "not related to his personal tax affairs" and that it was "not an audit." After he insisted on additional information, he was told to call IRS-CI Special Agent Tuan Ma who unlawfully disclosed to him, in violation of 26 U.S.C. § 6103, that John Anthony Castro was the target of a "grand jury" investigation. IRS-CI Special Agent Tuan Ma later submitted a Declaration under criminal penalties of perjury denying this; effectively claiming that an unrelated client, whom John Anthony Castro has never met, fabricated the event. It is critical to note that IRS-CI Special Agent Tuan Ma did not assert that the disclosure was made inadvertently or in good-faith; IRS Special Agent Tuan Ma outright denies ever disclosing the grand jury investigation to Christiaan Dekter. Christiaan Dekter is an Australian national, is not a U.S. citizen, and is not familiar with our grand jury system.

78.    On May 14, 2021, the Fort-Worth Star Telegram quoted John Anthony Castro calling former President Donald J. Trump a "false prophet" and stating his intent to run for President, if necessary, to prevent Trump's candidacy in 2024.

79.    On June 6, 2021, Microsoft notified John Anthony Castro that it had received a subpoena for privileged emails from the U.S. District Court for the Middle District of Florida two years prior on April 22, 2019, and that they provided said emails on May 10, 2019. The subpoena

was subject to a 2-year gag order. This was the first time John Anthony Castro learned that his right to privacy had been grossly violated.

80.    This was unlawful because the Texas Supreme Court extended the attorney-client privilege to federal practitioners in 2018. Someone at the DOJ lied to the court and claimed John Anthony Castro's emails were not privileged in order to unlawfully obtain and review them. This was a crime. This was fraud being perpetrated on the U.S. District Court for the Middle District of Florida. This crime must be investigated and criminally prosecuted.

81.    On September 3, 2021, John Anthony Castro was informed by the SmartVault Corporation that they had received a federal subpoena for information concerning the data files of his clients going back to January 1, 2015. The subpoena was dated August 31, 2021. However, the subpoena number was 2018R01689033, again suggesting that the grand jury assigned to this investigation was empaneled in 2018; shortly after John Anthony Castro's meeting with the D.C. U.S. Attorney's Chief of Fraud and Public Corruption, J.P. Cooney to report criminal wrongdoing by employees at JDFPG and the IRS.

82.    On October 18, 2021, John Anthony Castro was informed by Wolters Kluwer that they had received a federal subpoena for information concerning his firm Castro & Co.'s tax filings with their software, ProSystems FX Tax.

83.    On November 18, 2021, John Anthony Castro publicly declared and formally registered with the Federal Election Commission as a Candidate for the Republican Nomination for the Presidency of the United States with the stated intent to sue former President Donald J. Trump to declare him ineligible to pursue public office under Section 3 of the 14th Amendment for having given aid or comfort to the January 6, 2021, insurrectionists that attacked the United States Capitol.

84.    In retaliation and response, in early January 2022 in the final days of the Trump Administration, IRS-CI Special Agent Tuan Ma visited the homes of Castro & Co.'s Paralegal Celeste Doidge, Office Manager Alfonso Garza, and Director of Marketing Ismael Garza. According to their accounts, the questions were broad and generalized questions about our firm's processes and procedures; untethered to any valid investigatory purpose.  Then-President Donald J. Trump ordered this harassment.

85.    As John Anthony Castro suspected, the questions were *not* intended to determine whether a specific factual event or set of events constituted a crime but rather a fishing expedition to establish reasonable suspicion to perpetuate an ongoing investigation in order to justify continuing claims of privilege with regard to previously submitted FOIA requests that would have uncovered evidence of a conspiracy to retaliate against John Anthony Castro stemming from central Florida.

86.    On January 4, 2022, IRS-CI Special Agent Tuan Ma interviewed John Anthony Castro's former independent contractor James Robert Land.  After James Robert Land had already agreed to talk with him, IRS-CI Special Agent Tuan Ma unnecessarily and unlawfully disclosed, again in violation of 26 U.S.C. § 6103, that John Anthony Castro was the target of a criminal investigation.

87.    James Robert Land is a graduate of Christ for the Nations Institute in Dallas, Texas. Mr. Land is a pastor who founded several churches in the Dominican Republic.

88.    John Anthony Castro purposefully waited for there to be at least two confirmed violations of 26 U.S.C. § 6103.

**H. Castro Files Suit Targeting IRS-CI Special Agent Tuan Ma's Criminal Conduct**

89.    On January 7, 2022, John Anthony Castro John Anthony Castro filed a civil lawsuit under 26 U.S.C. § 7341 in the United States District Court for the Northern District of

Texas against the United States for criminal violations of John Anthony Castro's privacy rights under 26 U.S.C. § 6103 committed by IRS-CI Special Agent Tuan Ma.

90.   IRS-CI Special Agent Tuan Ma submitted a formal Declaration under criminal penalties of perjury stating that he made neither the disclosure to Christiaan Dekter nor James Robert Land.   In effect, IRS-CI Special Agent Tuan Ma is saying that an unrelated client in California and a missionary and pastor from the Dominican Republic who do not know each other are both lying.

91.   On February 22, 2022, the United States Patent and Trademark Office published Patent No. 11,257,167 titled "Tax Planning Using Video-Based Graphical User Interface and Artificial Intelligence." By May 2022, John Anthony Castro's new tax software company received a valuation of over $180 million.   John Anthony Castro anticipates the company to be valued at $2 billion by the end of 2025.   As one can imagine, John Anthony Castro exercised an extremely high degree of secrecy with regard to processes and procedures that were subject to an ongoing patent application that had the potential to be worth billions of dollars.

92.   Between January 10, 2022, and July 7, 2022, John Anthony Castro sent Assistant U.S. Attorney Chauncey Bratt a total of twelve (12) emails explaining his firm's processes and procedures.   In some of these emails, IRS-CI Special Agent Tuan Ma and Special Agent-in-Charge Brian Payne were copied.

93.   In response to legal inquiries, John Anthony Castro was informed that Assistant U.S. Attorney Chauncey Bratt had allegedly stated that no evidence regarding John Anthony Castro was ever presented to an actual grand jury, that he was not personally convinced John Anthony Castro engaged in criminal conduct, and that he was being promoted to Supervisor and would soon be off the case by summertime.

94.    On February 24, 2022, Internal Revenue Agent Lori Hill (IRS Agent Hill), also based out of central Florida, sent John Anthony Castro an Information Document Request for emails regarding the preparation of a client's 2015, 2016, 2017, and 2018 U.S. federal income tax returns.  An Information Document Request can only be enforced by a formal Summons.

95.    On February 24, 2022, John Anthony Castro responded via fax explaining that 26 U.S.C. § 7602(d) states that:

> "No summons may be issued under this title, and the Secretary may
> not begin any action under 26 U.S.C. § 7604 to enforce any summons,
> with respect to any person if a Justice Department referral is in effect
> with respect to such person... A Justice Department referral is in effect
> with respect to any person if... the Secretary has recommended to the
> Attorney General a grand jury investigation of... such person for any
> offense connected with the administration or enforcement of the
> internal revenue laws, or... any request is made under section
> 6103(h)(3)(B) for the disclosure of any return or return information
> (within the meaning of section 6103(b)) relating to such person."

96.    It was quite clear to John Anthony Castro that the IRS was attempting to use civil processes to "cure" the unlawfully obtained emails back in 2019.  John Anthony Castro ended the email with the following:

97.    "Ms. Hill, don't let them use you as a patsy. Do not sign the affidavit
for the summons. If they're confident there's reasonable suspicion,
ask them to sign the affidavit. If not, you're responsible for the content

22

of the affidavit, and that's how they shield themselves from liability.

They're using you. This is deeper, darker, and uglier than you think."

98.    On or about February 25, 2022, IRS Agent Hill withdrew the Information Document Request.

99.    On June 7, 2022, United States District Court Judge Reed C. O'Connor denied the Government's Motion to Dismiss the lawsuit concerning IRS-CI Special Agent Tuan Ma's criminal violations of 26 U.S.C. § 6103. Upon the case moving to the discovery phase, John Anthony Castro was informed that he was not permitted to have any communicate with IRS-CI Special Agent Tuan Ma's because he was now a quasi-party and witness in that civil action.

100.    At this point, the IRS knew that, if John Anthony Castro would be permitted to question IRS-CI Special Agent Tuan Ma under oath, their criminal conspiracy to retaliate against John Anthony Castro would be exposed.  They had to find a way to force John Anthony Castro to drop his case against IRS-CI Special Agent Tuan Ma.

101.    On July 2, 2022, the United States Patent and Trademark Office sent an Issue Notification informing John Anthony Castro that a second patent covering an additional 12 claims would be published on July 26, 2022, at U.S. Patent No. 11,397,995 further expanding on and solidifying the patent for "Tax Planning Using Video-Based Graphical User Interface And Artificial Intelligence."

102.    On July 6, 2022, the New York Times published an article revealing that Former FBI Director James Comey and Deputy Director Andrew McCabe were selected for a highly invasive audit.  The odds of this kind of audit among all taxpayers is 1 in 30,000.  Among Comey and McCabe's income bracket, it's more like 1 in 10,000.  However, to calculate the odds of two

high-profile Trump critics from the FBI being targeted for this audit, you multiple the odds. 10,000 multiplied by 10,000 is 100 million. If you add John Anthony Castro, the odds are 1 in 1 Trillion.

## I.   The IRS Unlawfully Retaliates in the Middle of Litigation by Revoking Castro's Electronic Filing Identification Number (EFIN)

103.   On July 7, 2022, John Anthony Castro was informed by his firm's staff that electronically filed returns were being rejected. John Anthony Castro contacted the Internal Revenue Service to inquire about the status of his Electronic Filing Identification Number (EFIN), which had inexplicably been revoked preventing Castro & Co. from electronically filing any tax returns as statutorily required by 26 U.S.C. § 6011(e)(3).

104.   The IRS employee with whom John Anthony Castro spoke informed him that the EFIN was revoked and that an explanatory letter had been mailed out. She offered to read the letter. The later stated that the EFIN has been revoked because the EFIN was being used to file "fraudulent returns." She further read over the phone that, in order to appeal the decision, he was required to contact someone specific listed on the letter. John Anthony Castro responded, "Let me guess. Is it [IRS-CI Special Agent] Tuan Ma?" The IRS employee responded in the affirmative. She read that he was required to contact IRS-CI Special Agent Tuan Ma at 321-441-2668.

105.   To date, John Anthony Castro is aware that the DOJ and IRS illegally obtained his privileged emails by fraud on a federal court, unlawfully disclosed that he was the target of a grand jury investigation violating his taxpayer privacy rights and good name, and unlawfully expelled him from the electronic filing system based on wholly unsubstantiated allegations with no basis in fact or law.

## J.   DOJ Orders IRS to Reinstate Castro's EFIN

106. In response to the EFIN revocation, John Anthony Castro filed suit in the U.S. District Court for the Northern District of Texas and sought preliminary injunctive relief. When a Trump-appointed Judge denied the requested relief, John Anthony Castro sought emergency review by the U.S. Court of Appeals for the Fifth Circuit. Then and only then did the DOJ agree to settle the case and ordered the IRS to reinstate Mr. Castro's firm's ability to electronically file federal income tax returns.

107. To this day, John Anthony Castro has not been accused of any specific wrongdoing, has not been subject to preparer penalties, has not had any disciplinary action taken against him by the IRS Office of Professional Responsibility, is current on all tax filings, has no outstanding debts, has been honest and cooperative within reason, and is still an active federal tax practitioner in good standing with the IRS. John Anthony Castro's tax practice is one of the most honest and transparent firms in the United States.

## V.    Legal Background

### A. The Prohibition of Weaponizing the IRS

108. The Executive Branch has a long history of weaponizing the IRS for political gains. While the most prolific use of the weaponization of our tax law occurred during the Nixon administration, scholars note that the improper influence on the activities of the IRS has been prevalent in every administration, even as early as the Hoover administration. *See* Leslie S. Garthwaite, *An End to Politically Motivated Audits of Churches? How Amendment to Section 7217 Can Preserve Integrity in the Tax Investigation of Churches Under Section 7611*, 60 Tax Law. 503, 513 (2007).

109. In 1998, Congress finally took action when implementing 26 U.S.C. § 7217 to eliminate the executive branch's political influence of the IRS. *Id.*

110. The enactment of 26 U.S.C. § 7217 was part of a greater approach to safeguard the IRS from political sabotage and restore the public's confidence in the administration of our tax laws.

111. Today, it is unlawful for the United States President, or any employee of the executive office, to request, directly or indirectly, the IRS to conduct an audit or other investigation of any particular taxpayer. *See* 26 U.S.C. § 7217(a);(e). The offense is punishable "by a fine in any amount not exceeding $5,000, or imprisonment of not more than 5 years, or both, together with the costs of prosecution." *See* 26 U.S.C. § 7217(d).

112. As even the IRS's IRM recognizes, the prohibition under 26 U.S.C. § 7217 applies even if the request is made through an intermediary. *See* IRM 9.5.11.2.4 (09-09-2004).

**B. The Fourth Amendment and the Right to Privacy**

113. The Fourth Amendment of the U.S. constitution protects the right to be secure "against unreasonable searches and seizures[.]"

114. "The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The "basic purpose of this Amendment," […] "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018).

115. The rudimentary application of the Fourth Amendment was tied to the common law trespass principles and focused on whether a Government agent physically intruded on a constitutionally protected area. *Id.* at 2213.

116. In the 1960s, the Supreme Court shifted its view on the Fourth Amendment and started focusing on the protection of people, not property, and expanded the privacy expectation beyond physical bounds of one's home. *Id.* (citing *Katz v. United States,* 389 U.S. 347, 351 (1967).

117. Now the Fourth Amendment provides protection when a person "seeks to preserve something as private" and such expectation is "one that society is prepared to recognize as reasonable. *Id.* (citing *Smith v. Maryland*, 44 U.S. 735, 740 (1979).

118. In *Carpenter*, the Supreme Court addressed the challenges of ensuring that the Fourth Amendment continues to protects a person against arbitrary power and intrusion and placing "obstacles in the way of a too permeating police surveillance[.]" in an era where technology increases the Government' capacity to intrude on "the privacies of life[.]" *Id.* at 2213 – 2214.

119. The Supreme Court pointed out that "[w]hen confronting new concerns brought by digital technology, this Court has been careful not to uncritically extend existing precedents." *Id.* at 2222 (2018).

120. Continuing on its trend to preserve one's privacy expectation, especially in our technology-driven era, Supreme Court placed restrains on the "third-party doctrine." *See generally, Id.*

121. The "third-party doctrine states that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Id.* at 2216  (citing *Smith v. Maryland*, 442 U.S. 735, 743-744 (1979)).

122. The Supreme Court pointed out that voluntary exposure of information, however, does not occur when sharing cell-site location information (CSLI) with a third party. CSLI is automatically shared with the provider and virtually any phone activity will generate CSLI. *See*

27

*Id.* at 2220. As such, the act of using a cell phone does not diminish a person's reasonable expectation of privacy. *Id.*

123. The Supreme Court held that because person maintains a reasonable expectation of privacy when operating a cell phone, the Government's acquisition of CSLI (from a third party) constitutes a search and warranted supported by probable cause is required. *Id.* at 2221.

124. In his dissent, Justice Kennedy compared CSLI to other business records that can be obtained with only a subpoena, such as bank records or credit card statements. *Id.* at 2224, (Kennedy, J., dissenting). Justice Kennedy theorized that a person has no reasonable expectation in information that is voluntarily conveyed to companies and over which a person cannot assert ownership or possession, such as CSLI. *Id.* at 2227, (Kennedy, J., dissenting). Despite disagreeing with the ultimate ruling of the Court, Justice Kennedy clearly pointed out that the third-party doctrine does not apply when the Government "obtains the modern-day equivalents of an individual's own "papers" or "effects," even when those papers or effects are held by a third party." *Id.* at 2230, (Kennedy, J., dissenting) (citing *United States v. Warshak,* 631 F.3d 266, 283–288 (6th Cir. 2010)).

125. The majority opinion called Justice Kennedy's dissent sensible and commented that "[i]f the third-party doctrine does not apply to the "modern-day equivalents of an individual's own 'papers' or 'effects,'" then the clear implication is that the documents should receive full Fourth Amendment protection." *Id.* at 2222.

126. The Sixth Circuit in *Warshak,* which was relied upon by Justice Kennedy, held that a "government may not compel a commercial [internet service provider] to turn over the contents of a subscriber's emails without first obtaining a warrant based on probable cause." *Warshak,* 631 F.3d at 288.

127. The Fifth Circuit, also citing to *Warshak,* agrees that "whether an intrusion constitutes a search or seizure" "hinges on whether the third party created the record to memorialize its business transaction with the target" or whether it was "simply recording its observation of a transaction between two independent parties[.]" *In re U.S. for Hist. Cell Site Data,* 724 F.3d 600, 610 - 611 (5th Cir. 2013). As such, the Fifth Circuit explains that information simply sent via a business is protected under the Fourth Amendment. *See In re U.S. for Hist. Cell Site Data,* 724 F.3d at 611.

128. The Fifth Circuit also cited to the Ninth Circuit's case *United States v. Forester* and quoted:

> "The government's surveillance of e-mail addresses also may be technologically sophisticated, but it is conceptually indistinguishable from government surveillance of physical mail.... E-mail, like physical mail, has an outside address 'visible' to the third-party carriers that transmit it to its intended location, and also a package of content that the sender presumes will be read only by the intended recipient." *In re U.S. for Hist. Cell Site Data,* 724 F.3d 600, 611 (5th Cir. 2013) (citing *United States v. Forrester,* 512 F.3d 500, 511 (9th Cir. 2008)).

129. Because e-mails are the modern-day equivalent of papers, a person has a reasonable privacy expectation in connection with e-mails and a warrant based on probable cause is required to obtain such information from a third party.

## C. BIVENS CLAIM

i. *Background*

130.   A constitutional claim pursuant to *Bivens* seek a federal equivalent remedy that a person has against state or local actors in accordance with 42 U.S.C. §1983. *Bivens*, 403 U.S. at 390.

131.   Under a *Bivens* claim, a federal court can enforce monetary damages against a federal officer, in his personal capacity, who violated a person's constitutional right. Such remedy is available despite the absent of any statutory authority or explicit language in the Constitution. *Ziglar*, 137 S. Ct. at 1854.

132.   In the landmark case *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* the Supreme Court held that if a petitioner "can demonstrate an injury consequent upon the violation by federal agents of his fourth amendment right", such petitioner is "entitled to redress his injury through a particular remedial mechanism normally available in the federal courts." *Bivens,* 403 U.S. at 397. In *Bivens*, petitioner suffered great "humiliation, embarrassment, and mental suffering as a result of the agents' unlawful conduct" when federal agents effected his arrest and search without a warrant. *Id.* at 390. Consequently, the Supreme Court held that the petitioner was "entitled to recover money damages for any injuries he has suffered as a result of the agents' violation of the [Fourth] Amendment." *Id.* at 397.

133.   The Supreme Court also extended the right to obtain money damages in instances where a federal agent violates the Due Process Clause of the Fifth Amendment of a person. *Davis v. Passman*, 442 U.S. 228, 228 (1979).

134.   The Supreme Court explained that a person has a right to recover damages when a federal agent violates such person's constitutional rights unless the defendant can demonstrate "special factors counselling hesitation on the absence of affirmative action by Congress" or when

30

Congress has provided an alternative remedy, "which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective." *Carlson v. Green*, 446 U.S. 14, 18 (1980).

135.   While the Supreme Court has not clearly defined what constitutes special factors counselling hesitation, the Supreme Court has provided guidance.

136.   When discussing *Bivens*, the Supreme Court has stressed time and time again that "no man in this country is so high that he is above the law." *Davis v. Passman*, 442 U.S. 228 (1979). Nevertheless, a special factor counseling hesitation comes into play when the wrongdoer is a federal agent, for example a congressman's action protected by the Speech or Debate clause, who may enjoy such independent status in our constitutional schemes to suggest that judicially created remedies against such agent might be inappropriate. *Carlson*, 446 U.S. 14, 19 (1980) (citing *Davis v. Passman, supra*, at 246), *see also* U.S. Const. amend. I, § 6.

137.   Another special factor counseling hesitation occurs when the wrongdoer is a judge or federal prosecutor acting within the scope of his duties and thereby enjoying complete immunity. *See Butz v. Economou*, 438 U.S. 478, 505-508 (1978).

138.   But the Supreme Court also highlighted that not all federal executive officials enjoy such complete immunity as it would "erode the protection provided by basic constitutional guarantees." *Id.* at 505.

139.   The Supreme Court held in *Butz* that "in a suit for damages arising from unconstitutional action, federal executive officials exercising discretion are entitled only to the qualified immunity. *Id.* at 507.

140. The Supreme Court in *Carlson* pointed out that qualified immunity provides federal agents with sufficient protection so that defending a suit would not interfere with an agent's efforts to perform one's official duties. *Carlson*, 446 U.S. at 19 (1980).

141. If a federal agent is seeking absolute immunity, such agent carries the burden of proof that a public policy supports such defense. *Butz*, 438 U.S. at 506.

### ii.  *Damages under Bivens*

142. In support of providing damages to a person under a *Bivens* claim, the Supreme Court has explained that allowing a person to receive compensation for damages also serves as a deterrent because the federal agent faces personal financial liability and not the United States.

143. John Anthony Castro incurred thousands of dollars in IT security as a result of this unlawful harassment.

144. Further, because in *Bivens*, the Supreme Court held that a person can obtain a recovery that is normally available in federal court, such recovery also includes a punitive damages award. In fact, the Supreme Court held that punitive damages "are especially appropriate to redress the violation by a Government official of a citizen's constitutional rights. *Carlson*, 446 U.S. at 22.

### iii.  *Bivens Claims Today*

145. In 2017, the Supreme Court called the expansion of *Bivens* claim a "disfavored" judicial activity. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017). But despite that, the Supreme court in *Ziglar* unequivocally emphasized that:

> "[T]his opinion is not intended to cast doubt on the continued force,
>
> or even the necessity, of *Bivens* in the search-and-seizure context in
>
> which it arose. *Bivens* does vindicate the Constitution by allowing
>
> some redress for injuries, and it provides instruction and guidance

to federal law enforcement officers going forward. The settled law of *Bivens* in this common and recurrent sphere of law enforcement, and the undoubted reliance upon it as a fixed principle in the law, are powerful reasons to retain it in that sphere." *Ziglar*, 137 S. Ct. at 1856–57 (2017).

146. While still not defining the phrase "special factors counselling hesitation" the Supreme court stated that the inquiry should focus on "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed. Thus, to be a "special factor counselling hesitation," a factor must cause a court to hesitate before answering that question in the affirmative." *Id.* at 1858 .

147. The Supreme Court has also explained that if there is a sound reason for a court to believe that Congress would question the "efficacy or necessity of a damages remedy," a court should refrain from creating a remedy. *Id.* And "if any alternative, existing process for protecting the [injured party's] interest" exist that itself may "amoun[t] to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Id.*

148. To determine whether a claim arises under an established *Bivens* claim or would extend such remedy, the court must determine whether the case at issue "is different in a meaningful way from previous *Bivens* cases decided by this Court," and if it is, "then the context is new." *Id.* at 1859.

149. However, the Courts should not completely stray away from awarding a monetary damages award under *Bivens* as "a case can present a new context for *Bivens* purposes if it implicates a different constitutional right; if judicial precedents provide a less meaningful

guide for official conduct; or if there are potential special factors that were not considered in previous *Biven* cases." *Id.* at 1864.

150.  As such, the proper two step analysis is: "Whether the request involves a claim that arises in a "new context" or involves a "new category of defendant" and if yes, "whether there are special factors [that] counse[l] hesitation[…]about granting the extension." *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020).

151.  In context of Fourth Amendment violations, the Supreme Court has held that Congress is better equipped to determine whether damages are appropriate if a border agent uses excessive force as this contains national security implications. Additionally, a Fourth Amendment claim is curbed when Congress already authorized alternative remedial measures. *Egbert v. Boule*, 142 S. Ct. 1793, 1807 (2022).

**D.  IRS Employee Oversight**

152.  Chapter 80, Subchapter A of the Internal Revenue Code (Title 26 U.S.C.) is titled "Application of Internal Revenue Laws" and sets forth the rule and obligation of the Department of the Treasury, The IRS Oversight Board, Commissioner of Internal Revenue, and other officials.

153.  26 U.S.C. § 7801 described the powers and duties of the secretary. While the code section states that the administration and enforcement of Title 26 is performed by or under the supervision of the secretary of the Treasury, it is void of any language requiring the Secretary to investigate and alleged violations.

154.  Pursuant to 26 U.S.C. § 7802, the IRS Oversight board is charged with overseeing the administration and the execution of the internal revenue law. *See* 26 U.S.C. § 7802. However, the IRS Oversight board has no authority or responsibilities with respect to criminal investigation. *See* 26 U.S.C. § 7802(c)(2)(B).

155.   As such, the internal revenue code does not provide for any remedial action if an IRS agent violates a person's constitutional rights.

**E.  DOJ Grievance Process**

156.   Section 1001 of the Patriot Act requires that the DOJ Inspector General reviews information and receive complaints alleging abuse of civil rights by DOJ employees.

157.   But the procedure is inadequate if a federal agent works under the direction of the DOJ, without being considered a DOJ employee. The DOJ's Office of the Inspector General webpage makes it clear that the DOJ Inspector General has limited jurisdiction, which do not include IRS agents working at discretion of a DOJ employee. *See  generally,* https://oig.justice.gov/hotline/submit_complain. As such, an IRS-CI investigator is not subject to the IRS Oversight board or the DOJ Grievance Process.

158.   There is no proper process if an IRS-CI Agent who is working under the limited supervision of prosecutors based on trust unlawfully engages in arbitrary fishing expeditions or perpetuate an investigation with the intent to harass. *See United States v. R. Enterprises, Inc.*, 498 U.S. 292, 301 (1991). Or if such agent cause sham subpoenas to be issued. A sham subpoena is a subpoena that serves little purpose. *See generally, United States v. Hammond*, 858 F2d 834 (2d Cir. 1988).

159.   The constitutionally inadequate internal procedures are ineffective at deterring future violations of IRS-CI agents as addressed in *United States v. R Enterprise, Inc.* by the Supreme Court. These further evidences the necessity of judicial intervention and checks and balances on the executive branch.

160. If the executive and legislative branches collude to deny citizens any relief for constitutional violations, it is imperative on the judiciary exercise its power of equity and reaffirm *Bivens* actions under the Fourth Amendment.

## VI.   DEMAND FOR JURY TRIAL

161. Pursuant Fed. R. Civ. P. 38(b), John Anthony Castro demands a trial by jury of all the issues plead, so triable.

## VII.   CONSTITUTIONAL COUNTS

### COUNT I
### Bivens Claim against Defendant

162. John Anthony Castro realleges and incorporates by references ¶¶ 1 -160.

163. Defendants were, at all times pertinent to this action, Federal actors who were acting under color of Federal law.

164. Defendants violated John Anthony Castro's Fourth Amendment right to be secure in his person and papers against unreasonable searched ad seizures without a warrant when Defendants accessed John Anthony Castro's e-mail from a secured third-party network without a proper warrant.

165. Defendants should have been aware that a proper warrant is needed to request e-mails from a third party as e-mails are the modern-day equivalent of papers as stated by the Supreme Court.

166. As such, Defendants are liable for the constitutional violations that they perpetrated.

167. No alternative legal remedy is available to John Anthony Castro. Even if John Anthony Castro were to request injunctive relief, the damage cannot be reversed. The Defendants

already dissected his protected and confidential information and used the information to harass, embarrass, and attempt to discredit John Anthony Castro.

168. As such, the *Bivens* claim is John Anthony Castro only means to seek justice.

169. The Supreme court has warned to be critical about extending existing precedents when being confronted with new concerns brought by digital technology. The Supreme Court has also stated that punitive damages are *especially* appropriate to redress violations by Government officials of one's constitutional right.

170. Today, the Government can conduct unlawful searches without breaking and entering into a person's home. Here, the Government used purely digital means to violate John Anthony Castro's constitutional rights.

171. As a result of the Government's unlawful digital search, John Anthony Castro was forced to invest heavily in additional IT security to ensure his clients' confidentiality. As a direct result of Defendants' reckless and unauthorized violations of John Anthony Castro's privacy rights, he incurred damages of $125,545.17, representing the cost of his firm's additional IT security.

172. The Government might believe that a lack of actual property damages reduces the possibility of a citizen seeking justice. This Court has the opportunity to put a stop to such radical behavior. Which is why John Anthony Castro is seeking punitive damages of $100,000,000.

**COUNT II**
**Unlawful Search and Seizure – Microsoft Subpoena**

173. John Anthony Castro realleges and incorporates by references ¶¶ 1 – 160.

174. The actions of the Defendants in causing the interception and search of John Anthony Castro's communication, including his confidential clients e-mails violated John

37

Anthony Castro's clearly established constitutional rights to be free from unlawful search and seizure and his right to privacy under the Fourth Amendment.

**COUNT III**
**Unlawful Search and Seizure – SmartVault Subpoena**

175.  John Anthony Castro realleges and incorporates by references ¶¶ 1 – 160.

176.  The actions of the Defendants in causing the interception and search of John Anthony Castro's confidential files of his clients violated John Anthony Castro's clearly established constitutional rights to be free from unlawful search and seizure and his right to privacy under the Fourth Amendment.

**COUNT VI**
**Unlawful Search and Seizure – Wolter Kuwler Subpoena**

177.  John Anthony Castro realleges and incorporates by references ¶¶ 1 – 160.

178.  Defendants' unlawful seizure and search of John Anthony Castro's confidential business files violated John Anthony Castro's clearly established constitutional rights to be free from unlawful search and seizure and his right to privacy under the Fourth Amendment.

WHEREBY, Plaintiff, John Anthony Castro respectfully request:

A.  Compensatory damages as to all defendants in the amount of $125,545;

B.  Punitive damages as to all defendants in the amount of $180,000,000;

C.  Reasonable attorney's fees and cost as to all defendants;

D.  Declaratory relief providing clarity on John Anthony Castro's legal rights in light of the numerous violations of his constitutional rights in the event that this Court determines that no right of action exists under *Bivens* or 26 U.S.C. § 7217; and

E.  Such other and further relief as may appear just and appropriate.

Respectfully submitted,

Dated: June, 5, 2023

JOHN ANTHONY CASTRO
12 Park Place
Mansfield, TX 76063
Tel. (202) 792- 6600
J.Castro@JohnCastro.com

**PLAINTIFF *PRO SE***

## Verification

I, John Anthony Castro, declare as follows:

1. I am the plaintiff in the present case, a U.S. citizen, and am actively pursuing the Republican nomination for the Presidency of the United States.

2. I am the founder and managing partner of Castro & Co.

3. I have personal first-hand knowledge of the matters set forth in this Complaint, and, if called upon to testify, I would competently testify as to the matters stated herein.

4. Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury that the entirety of the foregoing Complaint is true and correct.

Executed on June 5, 2023.

John Anthony Castro

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

JOHN ANTHONY CASTRO

**(b)** County of Residence of First Listed Plaintiff    TARRANT
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Pro Se

### DEFENDANTS

DONALD J. TRUMP, CHARLES RETTIG, MARIA CHAPA LOPEZ, TUAN MA, et al

County of Residence of First Listed Defendant   Palm Beach County, FL
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

|   |   |   |   |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|   | PTF | DEF |   | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 690 Other | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 710 Fair Labor Standards Act | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | **IMMIGRATION** | |
| | | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | |
| | | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer    ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*

Brief description of cause:
BIVENS ACTION FOR 4TH AMENDMENT VIOLATIONS

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
180,125,545

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☒ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE
06/05/2023

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____