IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

_____

JOHN ANTHONY CASTRO,

     Plaintiff,

v.

DONALD J. TRUMP, et al.,

     Defendants.

Civil Action No. 4:23-CV-556-Y

**DEFENDANTS CHARLES RETTIG, MARIA CHAPA LOPEZ,
TUAN MA, ANNE CRAIG-PENA, ANTON PUKHALENKO,
ESTELA WELLS, AND JOHN TURNICKY'S MOTION TO DISMISS**

LEIGHA SIMONTON
UNITED STATES ATTORNEY

George M. Padis
  Texas Bar No. 24088173
Najib H. Gazi
  Texas Bar No. 24131329
Assistant United States Attorneys
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
214.659.8600
Fax: 214.659.8811
george.padis@usdoj.gov
najib.gazi@usdoj.gov

*Attorneys for Defendants Charles Rettig,
Maria Chapa Lopez, Tuan Ma, Anne Craig-
Pena, Anton Pukhalenko, Estela Wells, and
John Turnicky*

# TABLE OF CONTENTS

I.   Background ........................................................................................................ 2

II.  Legal Standards ............................................................................................... 5

    A.   Rule 12(b)(2) Pleading Standard ........................................................ 5

    B.   Rule 12(b)(3) Pleading Standard ........................................................ 5

    C.   Rule 12(b)(6) Pleading Standard ........................................................ 7

    D.   Qualified Immunity from *Bivens* Liability ........................................ 7

III. Argument and Authorities ............................................................................... 9

    A.   The Court should dismiss the case for lack of personal jurisdiction. ................... 9

        1.   None of the federal Defendants are domiciled in Texas. .......................... 11

        2.   The federal Defendants' alleged actions in the underlying controversy create no connections to Texas. ............................................. 11

    B.   The Court should dismiss the case for improper venue. ....................................... 11

        1.   Venue is improper because the Defendants do not reside in Texas. .......... 12

        2.   Venue is improper because a substantial part of the events giving rise to Castro's claims did not occur within this judicial district. ............. 12

        3.   This action should be dismissed, not transferred. ..................................... 13

    C.   Because the *Bivens* issue is "antecedent" to qualified immunity, the Court should decide the *Bivens* question first. .............................................. 13

    D.   The Court should not engage in disfavored judicial activity by extending *Bivens* to this new context. ................................................................................... 14

        1.   If a plaintiff's claim meaningfully differs from *Bivens*, *Carlson*, or *Davis*, then the claim presents a new *Bivens* context. ............................... 15

        2.   If special factors counsel hesitation or alternative remedies are available, then the Court should not create a *Bivens* remedy. ................... 17

        3.   *Egbert* forecloses relief for Castro's First Amendment claims dressed up in Fourth Amendment garb. .......................................................... 18

4.      U.S. Courts of Appeals including the Fifth Circuit have held that a "malicious-prosecution-type claim" presents a new *Bivens* context. ....... 18

5.      Alternative remedies "alone" preclude a new *Bivens* remedy. ................. 23

6.      Other special factors counsel against a new *Bivens* remedy. .................... 31

E.      The Court should grant the federal Defendants qualified immunity. ................... 35

1.      Castro has not sufficiently alleged that the federal Defendants were personally involved in violating the Constitution. .................................... 36

2.      Liability for subpoenaing privileged records in Castro's peculiar circumstances was not clearly established. ................................................ 46

IV.     Conclusion .................................................................................................................... 47

## Cases

*Adams v. Johnson*,
  355 F.3d 1179 (9th Cir. 2004) .......................................................................... 26, 27

*Ahmed v. Weyker*,
  984 F.3d 564 (8th Cir. 2020) ........................................................................... passim

*Alexander v. City of Round Rock*,
  854 F.3d 298 (5th Cir. 2017) ...................................................................................... 9

*Al-Haramain Islamic Found., Inc. v. Obama*,
  705 F.3d 845 (9th Cir. 2012) .................................................................................... 30

*Allen v. Northrop Grumman*,
  No. 3:19-CV-0491-B (N.D. Tex Mar. 28, 2019.) ...................................................... 3

*Ambraco, Inc. v. Bossclip B.V.*,
  570 F.3d 233 (5th Cir. 2009) ...................................................................................... 6

*Amobi v. D.C. Dep't of Corrections*,
  257 F.R.D. 8 (D.D.C. 2009) ..................................................................................... 28

*Annappareddy v. Pascale*,
  996 F.3d 120 (4th Cir. 2021) ........................................................................... passim

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011) .................................................................................................... 8

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................................... passim

*Attkisson v. Holder*,
  925 F.3d 606 (4th Cir. 2019) ............................................................................. 21, 30

*Atuahene v. City of Hartford*,
  10 F. App'x 33 (2d Cir. 2001) .................................................................................. 36

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................................... 7

*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*,
  403 U.S. 388 (1971) ......................................................................................... passim

*Blair v. United States*,
  250 U.S. 273 (1919) .................................................................................................. 34

*Bradt v. Smith*,
  634 F.2d 796 (5th Cir. 1981) ............................................................................. 45, 46

*Brown v. Callahan*,
  623 F.3d 249 (5th Cir. 2010) ...................................................................................... 9

*Brunoehler v. Tarwater*,
  743 F. App'x 740 (9th Cir. 2018) ..................................................................... 21, 29

*Bulkley & Assocs., L.L.C. v. Dep't of Indus. Relations*,
   1 F.4th 346 (5th Cir. 2021) ................................................................................. 10

*Butts v. Martin*,
   877 F.3d 571 (5th Cir. 2017) ......................................................................... 15, 17

*Caldwell v. Palmetto State Sav. Bank of S.C.*,
   811 F.2d 916 (5th Cir. 1987) ................................................................................. 6

*Campbell v. Louisiana*,
   523 U.S. 392 (1998) .............................................................................................. 25

*Cantú v. Moody*,
   933 F.3d 414 (5th Cir. 2019) ......................................................................... passim

*Carlson v. Green*,
   446 U.S. 14 (1980) ......................................................................................... passim

*Carmona v. Leo Ship Mgmt., Inc.*,
   924 F.3d 190 (5th Cir. 2019). .............................................................................. 10

*Castro v. Berg*,
   No. 3:18-CV-0573-N (N.D. Tex. Mar. 5, 2019) .................................................... 3

*Castro v. Campbell*,
   No. 3:18-CV-0467-B (N.D. Tex. Apr. 13, 2018) ................................................... 2

*Castro v. Georgetown Univ.*,
   No. 3:18-CV-645-M (N.D. Tex. Aug. 14, 2018)..................................................... 3

*Castro v. Gudorf,*
   No. 3:18-CV-575-K (N.D. Tex. Mar. 20, 2018) .................................................... 2

*Castro v. Internal Revenue Serv.*,
   No. 4:22-cv-00810-P (N.D. Tex. Oct. 7, 2022) ..................................................... 2

*Castro v. United States*,
   No. 4:22-CV-00016-O-BP, 2023 WL 3848386 (N.D. Tex. June 6, 2023) .............. 2

*Castro v. United States*,
   No. 4:22-CV-00016-O-BP, 2023 WL 4444980 (N.D. Tex. Mar. 29, 2023), *R&R adopted*,
   2023 WL 3848386 (N.D. Tex. June 6, 2023) ............................................. 1, 27, 42

*Cent. Freight Lines Inc. v. APA Transp. Corp.*,
   322 F.3d 376 (5th Cir. 2003) ................................................................................. 5

*Colton v. United States*,
   306 F.2d 633 (2nd Cir. 1962) .............................................................................. 42

*Connor v. Matthews*,
   134 F. Supp. 2d 797 (N.D. Tex. 2001). ............................................................... 27

*Cope v. Cogdill*,
   3 F.4th 198 (5th Cir. 2021) ................................................................................. 46

*Crawford-El v. Britton*,
   523 U.S. 574 (1998) ............................................................................................ 33

*Cronn v. Buffington,*
 150 F.3d 538 (5th Cir. 1998) ........................................................................ 8

*Dahn v. United States,*
 127 F.3d 1249 (10th Cir. 1997) ................................................................... 28

*Daimler AG v. Bauman,*
 571 U.S. 117 (2014) ................................................................................... 10

*Davis v. Alaska,*
 415 U.S. 308 (1974) ................................................................................... 24

*Davis v. Passman,*
 442 U.S. 228 (1979) ........................................................................ 14, 15, 16

*DeCamp v. Douglas Cnty. Franklin Grand Jury,*
 978 F.2d 1047 (8th Cir. 1992) ............................................................... 25, 34

*Degen v. United States,*
 517 U.S. 820 (1996) ................................................................................... 34

*Doe v. Robertson,*
 751 F.3d 383 (5th Cir. 2014) ..................................................................... 8, 9

*Dye v. Hofbauer,*
 197 F. App'x 378 (6th Cir. 2006) ................................................................ 46

*Evans v. Chalmers,*
 703 F.3d 636 (4th Cir. 2012) ...................................................................... 36

*Falsone v. United States,*
 205 F.2d 734 (5th Cir. 1953) ...................................................................... 42

*Farah v. Weyker,*
 926 F.3d 492 (8th Cir. 2019) ............................................................... passim

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.,*
 141 S. Ct. 1017 (2021) ............................................................................... 10

*Gerstein v. Pugh,*
 420 U.S. 103 (1975) ................................................................................... 35

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
 564 U.S. 915 (2011) ................................................................................... 10

*Greenlaw v. Klimek,*
 No. 4:20-CV-311, 2021 WL 6112784 (E.D. Tex. Dec. 27, 2021) .......... 20, 23, 30

*Gundle Lining Constr. Corp. v. Adams Cnty. Asphalt, Inc.,*
 85 F.3d 201 (5th Cir. 1996) ........................................................................ 10

*Harlow v. Fitzgerald,*
 457 U.S. 800 (1982) ..................................................................................... 8

*Hartman v. Moore,*
 547 U.S. 250 (2006) ................................................................................... 33

*Hernandez v. Mesa,*
    140 S. Ct. 735 (2020).................................................................................. 14, 46

*Hernandez v. Mesa,*
    582 U.S. 548 (2017) ....................................................................................... 14

*Hernández v. Mesa,*
    885 F.3d 811 (5th Cir. 2018) (en banc) ........................................................ 16

*Huie v. DeShazo,*
    922 S.W.2d 920 (Tex. 1996) .......................................................................... 45

*Illinois v. Rodriguez,*
    497 U.S. 177 (1990). ...................................................................................... 35

*In re Grand Jury Proc.,*
    517 F.2d 666 (5th Cir. 1975) ......................................................................... 42

*In re Sealed Case No. 97–3025,*
    131 F.3d 208 (D.C. Cir. 1997) ....................................................................... 33

*In re Silver,*
    540 S.W.3d 530 (Tex. 2018) ............................................................. 42, 43, 44

*Inst. for Creation Res. Graduate Sch. v. Paredes,*
    No. 3:09-CV-0693-B, 2009 WL 4333366 (N.D. Tex. Dec. 1, 2009)................ 6

*Int'l Shoe Co. v. Washington,*
    326 U.S. 310 (1945) ....................................................................................... 10

*Kelley v. Fed. Bureau of Investigation,*
    67 F. Supp. 3d 240 (D.D.C. 2014).................................................................. 29

*Klayman v. Nat'l Sec. Agency,*
    280 F. Supp. 3d 39 (D.D.C. 2017) *aff'd sub nom., Klayman v. Obama,* 759 F. App'x 1 (D.C. Cir. 2019)................................................................................................ 21

*Kohler v. Englade,*
    470 F.3d 1104 (5th Cir. 2006) ................................................................ 32, 41

*Lawson v. U.S. Dep't of Just.,*
    527 F. Supp. 3d 894 (N.D. Tex. 2021) ............................................................ 6

*Lowery v. Estelle,*
    533 F.2d 265 (5th Cir. 1976) ........................................................................... 6

*Luv N' care, Ltd. v. Insta–Mix, Inc.,*
    438 F.3d 465 (5th Cir. 2006). .......................................................................... 5

*Malley v. Briggs,*
    475 U.S. 335 (1986) ......................................................................................... 8

*Marcilis v. Township of Redford,*
    693 F.3d 589 (6th Cir. 2012) ......................................................................... 36

*Mayfield v. United States,*
    599 F.3d 964 (9th Cir. 2010) ......................................................................... 30

*McClintock v. Sch. Bd. E. Feliciana, Par.*,
   299 F. App'x 363 (5th Cir. 2008) .................................................................. 6

*McDonald v. McClelland*,
   779 F. App'x 222 (5th Cir. 2019) .................................................................. 37

*McQueen v. United States*,
   5 F. Supp. 2d 473 (S.D. Tex. 1998) .............................................................. 34

*Meredith, et al., v. United States*,
   No. 3:18-cv-2130-M (N.D. Tex. Jan. 30, 2019) ............................................ 2

*Morgan v. Swanson*,
   659 F.3d 359 (5th Cir. 2011) (en banc) .................................................... 8, 9

*Neptune v. Carey*,
   No. CV1712057BRMLHG, 2019 WL 913156 (D.N.J. Feb. 25, 2019) ................. 36

*Nichols v. G.D. Searle & Co.*,
   991 F.2d 1195 (4th Cir. 1993) ................................................................ 7, 13

*Nuttall v. Juarez*,
   984 F. Supp. 2d 637 (N.D. Tex. 2013) ........................................................... 6

*Oliva v. Nivar*,
   973 F.3d 438 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 2669 (2021) ............... passim

*Page v. Comey*,
   628 F. Supp. 3d 103 (D.D.C. 2022) ............................................................. 28

*Pearson v. Callahan*,
   555 U.S. 223 (2009) .................................................................................... 9

*Phillips v. Whittington*,
   No. 20-30731, 2022 WL 797418 (5th Cir. Mar. 15, 2022) ......................... 37

*Powers v. Ohio*,
   499 U.S. 400 (1991) .................................................................................. 25

*Reichle v. Howards*,
   566 U.S. 658 (2012) .................................................................................... 8

*Robbins v. Oklahoma*,
   519 F.3d 1242 (10th Cir. 2008) .................................................................. 36

*Robert S. v. United States*,
   No. 16-CV-310-WMC, 2016 WL 7046851 (W.D. Wis. Dec. 2, 2016). ............. 38

*S.M. v. Krigbaum*,
   808 F.3d 335 (8th Cir. 2015) ...................................................................... 36

*Saucier v. Katz*,
   533 U.S. 194 (2001) .................................................................................. 47

*Schlobohm v. Schapiro*,
   784 S.W.2d 355 (Tex. 1990) ...................................................................... 10

*Shvartser v. Lekser,*
No. CV 16-1199 (JDB), 2017 WL 8944907 (D.D.C. July 5, 2017).....................28

*Singh v. RadioShack Corp.,*
882 F.3d 137 (5th Cir. 2018) ...............................................................................7

*Stafford v. Briggs,* 444 U.S. 527 (1980) ..................................................................12

*Sullivan v. Leor Energy, LLC,*
600 F.3d 542 (5th Cir. 2010) ................................................................................7

*United States v. Armstrong,*
517 U.S. 456 (1996) ............................................................................................33

*United States v. Burga,*
No. 18CV01633BLFSVK, 2019 WL 3859157 (N.D. Cal. Aug. 16, 2019) ...........43

*United States v. Calandra,*
414 U.S. 338 (1974) ............................................................................................26

*United States v. Cotton,*
535 U.S. 625 (2002) ............................................................................................25

*United States v. Finley,*
434 F.2d 596 (5th Cir. 1970) ..............................................................................42

*United States v. Frederick,*
182 F.3d 496 (7th Cir.1999) ...............................................................................43

*United States v. Gillock,*
445 U.S. 360 (1980) ............................................................................................42

*United States v. KPMG LLP,*
237 F. Supp. 2d 35 (D.D.C. 2002).......................................................................43

*United States v. Lefkowitz,*
618 F2d 1313 (9th Cir 1980) ..............................................................................45

*United States v. Ortega,*
854 F.3d 818 (5th Cir. 2017) ........................................................................32, 41

*United States v. R. Enters., Inc.,*
498 U.S. 292 (1991) ...............................................................................26, 32, 34

*United States v. Squillacote,*
221 F.3d 542 (4th Cir 2000) ...............................................................................45

*United States v. Williams,*
504 U.S. 36 (1992) ..............................................................................................25

*Vasquez v. Hillery,*
474 U.S. 254 (1986) ............................................................................................25

*Veg Corp, Inc. v. United States,*
No. 217CV02893JCMNJK, 2018 WL 3620497 (D. Nev. July 30, 2018)...............38

*Vennes v. An Unknown No. of Unidentified Agents of U.S.,*
  26 F.3d 1448 (8th Cir. 1994) ........................................................................ 28

*Wages v. Internal Revenue Serv.,*
  915 F.2d 1230 (9th Cir. 1990) ...................................................................... 26

*Wayte v. United States,*
  470 U.S. 598 (1985) ........................................................................................ 33

*Weatherford v. Bursey,*
  429 U.S. 545 (1977) ........................................................................................ 46

*Whitaker v. Barksdale Air Force Base,*
  No. CIV.A. 14-2342, 2015 WL 574697 (W.D. La. Feb. 11, 2015) ........................ 37

*Wilkie v. Robbins,*
  551 U.S. 537 (2007) ........................................................................................ 17

*Wyatt v. Fletcher,*
  718 F.3d 496 (5th Cir. 2013) .......................................................................... 9

*Wyatt v. Fletcher,*
  718 F.3d 496 (5th Cir. 2013). ........................................................................ 46

*Ziglar v. Abbasi,*
  582 U.S. 120 (2017) .................................................................................. passim

**Statutes**

18 U.S.C. § 1621 .............................................................................................. 30

18 U.S.C. § 2520 .............................................................................................. 29

18 U.S.C. § 2703 .............................................................................................. 29

18 U.S.C. § 2712 .............................................................................................. 29

18 U.S.C. § 3006A ............................................................................................ 25

18 U.S.C. § 3161 .............................................................................................. 26

26 U.S.C. § 6103 .............................................................................................. 27

26 U.S.C. § 7213 .............................................................................................. 27

26 U.S.C. § 7217 ................................................................................................ 5

26 U.S.C. § 7431 .............................................................................................. 27

26 U.S.C. § 7432 .............................................................................................. 27

26 U.S.C. § 7433 ........................................................................................ 26, 27

26 U.S.C. § 7435 .............................................................................................. 27

26 U.S.C. § 7525 .............................................................................................. 43

26 U.S.C. § 7802 .............................................................................................. 27

28 U.S.C. § 1391 ........................................................................................ 2, 12

28 U.S.C. § 1406 ................................................................................................ 6

50 U.S.C. § 1089 ........................................................................................ 30

50 U.S.C. § 1804 ........................................................................................ 30

50 U.S.C. § 1810 ........................................................................................ 30

50 U.S.C. § 1823 ........................................................................................ 30

**Rules**

Federal Rule of Civil Procedure 12 ..................................................... 5, 6, 7

Federal Rule of Civil Procedure 41 ............................................................ 6

Federal Rule of Criminal Procedure 6 ................................................. 24, 25

Federal Rule of Criminal Procedure 7 ....................................................... 25

Federal Rule of Evidence 501 .................................................................... 42

Texas Rule of Evidence 503 ................................................................ 43, 45

**Constitutional Provisions**

U.S. Const. amend IV. ......................................................................... passim

U.S. Const. amend. VII ............................................................................. 26

Defendants Charles Rettig, Maria Chapa Lopez, Tuan Ma, Anne Craig-Pena, Anton Pukhalenko, Estela Wells, and John Turnicky (the federal Defendants)[1] assert qualified immunity from Plaintiff John Anthony Castro's claims under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) seeking damages for alleged violations of the Fourth Amendment. Castro is the subject of a federal criminal investigation, and this lawsuit represents his latest collateral attack on that investigation.[2] Here, Castro alleges that federal agents made misrepresentations or omissions in connection with obtaining grand-jury subpoenas compelling third parties (including Microsoft, SmartVault, and Wolters Kluwer) to produce Castro's records. Specifically, Castro alleges that IRS special agent Tuan Ma (a special agent in the IRS Criminal Investigation Division) omitted that the emails and records hosted by these third parties were protected by the attorney–client privilege. Castro also alleges that unnamed federal actors accessed his emails from a secured third-party network without a warrant.

Because the federal Defendants are not domiciled in Texas and the alleged conduct did not occur in Texas, the Court should dismiss the claims against the federal Defendants for lack of personal jurisdiction or improper venue. Further, because a *Bivens* remedy should not be extended to this new context, Castro's claims against the federal Defendants should be dismissed with prejudice. Alternatively, each of the federal Defendants should be granted qualified immunity from Castro's claims.

---

[1] To be clear, attorneys from the U.S. Department of Justice (DOJ) do not represent Defendant Donald J. Trump in this case, and the arguments in this motion are only presented to support the defenses of the seven individual defendants specifically identified above for whom DOJ representation has been approved. "Federal Defendants" in this motion refers to these seven individuals.

[2] *See, e.g.*, *Castro v. United States*, No. 4:22-CV-00016-O-BP, 2023 WL 4444980, at *6 (N.D. Tex. Mar. 29, 2023) ("[T]he Court finds that Ma could reasonably conclude that he was authorized to orally disclose that he was conducting a criminal investigation."), *R&R adopted*, 2023 WL 3848386 (N.D. Tex. June 6, 2023).

# I.    BACKGROUND[3]

John Anthony Castro is not a lawyer. Although Castro holds himself out to the public as an "International Tax Attorney," Pl.'s Compl. ¶ 29, ECF No. 1, he does not appear to be licensed to practice law in any state or in front of any court. *See id.* ¶¶ 27–29. Castro claims to be a federal practitioner based on his limited authorization to practice tax law before the Internal Revenue Service (IRS). *Id.* ¶ 28. Using this authorization, Castro operates the tax-preparation firm, Castro & Co. *See id.* ¶ 75. Castro's activities as a tax preparer apparently have led to him being the subject of a federal criminal investigation. *See id.* ¶¶ 77, 81–82, 86, 104–105.

Castro is a serial filer of lawsuits in this District. He has filed a lawsuit collaterally attacking the criminal investigation concerning which he is a subject—alleging Defendant Ma improperly disclosed to certain witnesses that Castro was a subject of a criminal investigation—that the district court dismissed with prejudice. *Castro v. United States*, No. 4:22-CV-00016-O-BP, 2023 WL 3848386, at *1 (N.D. Tex. June 6, 2023); *see* Compl. ¶¶ 89–90. He has also sued the IRS for revoking his Electronic Filing Identification Number but voluntarily dismissed the suit on October 7, 2022. Notice of Voluntary Dismissal, *Castro v. Internal Revenue Serv.*, No. 4:22-cv-00810-P (N.D. Tex. Oct. 7, 2022), ECF No. 14; *see* Compl. ¶ 106. Federal courts in this District have also repeatedly *sua sponte* transferred (or granted motions to dismiss) cases filed by Castro or his firm for lack of venue or personal jurisdiction.[4]

---

[3] The following factual background is drawn from Plaintiff's Complaint, ECF No. 1, unless otherwise noted.

[4] *See, e.g.*, Order Transferring Case, *Castro v. Campbell*, Civ. No. 3:18-CV-0467-B (N.D. Tex. Apr. 13, 2018), ECF No. 10 ("Regardless of where Plaintiff resides or where his law firm is headquartered, Plaintiff has not demonstrated venue is proper in this district. A plaintiff's residence is not a basis to establish venue under § 1391 . . . ."); Order, *Castro v. Gudorf*, No. 3:18-CV-575-K (N.D. Tex. Mar. 20, 2018), ECF No. 4 ("[O]n the Court's own motion, this case is TRANSFERRED to the United States District Court for the Southern District of Ohio, Western Division. 28 U.S.C. §§ 1404(a), 1406(a))."); Order, *Meredith v. United States*, No. 3:18-cv-2130-M (N.D. Tex. Jan. 30, 2019), ECF No. 9 (granting the government's motion to dismiss for improper venue because named defendants neither resided in nor performed a substantial part of the events or omissions giving rise to plaintiffs' claims in the Northern District of Texas); *see also* Memorandum Opinion & Order at 5–6, *Castro v. Berg*, No. 3:18-CV-0573-N (N.D. Tex.

In this case, Castro alleges he is the subject of a criminal investigation in retaliation for his political activities. In 2017, Castro joined the efforts of like-minded Republicans to reduce then-President Donald J. Trump's influence on the Republican Party. *See* Compl. ¶ 36. As part of this effort, Castro engaged in anti-Trump political advertising in swing states, worked in concert with other Republican groups to defeat Trump-aligned candidates in various elections, and ran for political office. *See id.* ¶¶ 37, 42, 66, 76. After former President Trump's defeat in the 2020 general election, Castro continued his efforts to combat the former President's influence by running for President in 2024. *See id.* ¶¶ 78, 83.

Castro alleges that the former President noticed Castro's efforts and directed federal agents, including the federal Defendants, to investigate Castro and deter him from further political activity. *See, e.g.*, *id.* ¶¶ 15–23, 25, 38, 58, 69, 84.

Castro claims that in response to former President Trump's instructions and in retaliation for Castro's efforts to hold IRS agents accountable, IRS investigators began unlawfully prying into his electronic records. *See id.* ¶¶ 39–53. As part of his tax-consulting business, Castro took on clients in Australia and Florida. *Id.* ¶¶ 39, 47. These matters led to disputes where Castro attempted to report misconduct by IRS agents, only to become embroiled in a retaliatory investigation. *Id.* ¶¶ 39–51.

Castro alleges that as part of this investigation, Defendant Ma omitted the privileged nature of Castro's emails from the U.S. District Court for the Middle District

---

Mar. 5, 2019), ECF No. 22 ("And mere injury to a forum resident is not a sufficient basis authorizing jurisdiction. Accordingly, the Court grants Defendants' motion to dismiss for lack of personal jurisdiction." (citation omitted)); Memorandum Opinion & Order at 4, *Castro v. Georgetown Univ.*, No. 3:18-CV-645-M (N.D. Tex. Aug. 14, 2018), ECF No. 19 ("Because Castro has failed to allege a basis for this Court to exercise personal jurisdiction over Defendants, Defendants' Motion to Dismiss is GRANTED and this case is DISMISSED WITHOUT PREJUDICE."); Plaintiffs' Notice of Dismissal, *Allen v. Northrop Grumman*, No. 3:19-CV-0491-K (N.D. Tex. Mar. 28, 2019), ECF No. 23 (case voluntarily dismissed after the filing of a motion to dismiss for lack of personal jurisdiction or lack of venue).

of Florida to secure a subpoena. *Id*. ¶¶ 52–53. Microsoft responded to this subpoena on May 10, 2019, *id*. ¶ 52, but did not notify Castro until June 2021 due to a two-year gag order. *Id*. ¶ 79. Castro first became aware of the federal investigation in October 2020 when Georgetown University informed him that they had received a grand-jury subpoena requesting his education records. *Id*. ¶ 68. Castro alleges that Defendant Ma engaged in misconduct by seeking these education records with no valid investigatory purpose. *Id*. ¶ 71. In September 2021, SmartVault Corporation informed Castro that it had received a federal subpoena for his clients' files dating back to January 1, 2015. *Id*. ¶ 81. In October 2021, Wolters Kluwer informed Castro that it had received a federal subpoena for information related to his tax firm's filings using the company's software. *Id*. ¶ 82. Castro does not allege that any of these activities took place in Texas. *See generally id*.

Castro also claims that individuals at the Joint Defense Facility at Pine Gap (JDFPG) "abused their access to government spying systems to engage in the unauthorized electronic surveillance of John Anthony Castro" from August 2018 to February 2023. *Id*. ¶ 22. These individuals supposedly monitored "Castro's communications with JDFPG employees regarding their tax matters with John Anthony Castro in his capacity as an International Tax Attorney" and "then expanded to monitor John Anthony Castro's communications with non-JDFPG clients, personal communications, cell phone calls, text messages, home internet activity, and home internet cameras." *Id*. ¶ 23.

Castro filed this lawsuit in June 2023, alleging four causes of action: (1) the federal Defendants accessed his email accounts without a warrant in violation of the

Fourth Amendment[5]; (2) the federal Defendants accessed records obtained by the Microsoft subpoena in violation of the Fourth Amendment; (3) the federal Defendants accessed records obtained by the SmartVault subpoena in violation of the Fourth Amendment; and (4) the federal Defendants accessed records obtained by the Wolters Kluwer subpoena in violation of the Fourth Amendment. *Id.* ¶¶ 162–78. All four causes of action seek damages under *Bivens*. *See id.* at 38, ¶¶ A–E.[6]

## II.    LEGAL STANDARDS

### A.    Rule 12(b)(2) Pleading Standard

Under Rule 12(b)(2), the Court should dismiss a claim if it lacks personal jurisdiction over the defendant. Fed. R. Civ. P. 12(b)(2). If the Court resolves the Rule 12(b)(2) motion without an evidentiary hearing, the party invoking jurisdiction, i.e. the plaintiff, bears the burden to make a prima facie case that the Court may exercise personal jurisdiction over the defendant. *See Cent. Freight Lines Inc. v. APA Transp. Corp.*, 322 F.3d 376, 380 (5th Cir. 2003). The "court must resolve all undisputed facts submitted by the plaintiff, as well as all facts contested in the affidavits, in favor of jurisdiction." *Luv N' care, Ltd. v. Insta–Mix, Inc.,* 438 F.3d 465, 469 (5th Cir. 2006).

### B.    Rule 12(b)(3) Pleading Standard

A plaintiff has a "threshold obligation to show that the case belongs in the

---

[5] Castro's allegations related to the search of his emails are internally inconsistent. In some instances, he claims that there was no warrant at all, Compl. ¶ 164, and in others, he acknowledges that there may have been a warrant but that it lacked probable cause, *see* Compl. ¶ 18.

[6] *But see* Compl. 38, ¶ D (alternatively seeking "[d]eclaratory relief providing clarity" on Castro's supposed legal rights "in the event that this Court determines that no right of action exists under *Bivens*"). Because declaratory relief under *Bivens* is unavailable, Castro's request for declaratory relief should be dismissed. *See, e.g.*, *Dowell v. Kobayashi*, No. CV H-22-4486, 2023 WL 2227712, at *4 (S.D. Tex. Feb. 24, 2023) (dismissing request for "declaratory and injunctive relief" reasoning "even when relief under Bivens is generally available, a plaintiff is entitled to only monetary, not injunctive, relief." (collecting cases)). Castro's prayer for relief mentions 26 U.S.C. § 7217, Compl. 38, ¶ D, as does the legal background section of his Complaint, *id.* ¶¶ 109–112. But all of his claims appear premised on alleged constitutional violations only. *See id.* ¶¶ 163–178. Thus, he has not pleaded a claim that would entitle him to his requested relief under section 7217.

particular district court in which" it has chosen to sue. *Lawson v. U.S. Dep't of Just.*, 527 F. Supp. 3d 894, 896 (N.D. Tex. 2021). Thus, under Federal Rule of Civil Procedure 12(b)(3), a defendant may move to dismiss a complaint based on improper venue. Fed. R. Civ. P. 12(b)(3). Once a defendant asserts this defense, courts in the Fifth Circuit have generally held the plaintiff bears the burden of showing that venue is proper "as to each defendant and each claim." *Nuttall v. Juarez*, 984 F. Supp. 2d 637, 642 (N.D. Tex. 2013); *see also Inst. for Creation Res. Graduate Sch. v. Paredes*, No. 3:09-CV-0693-B, 2009 WL 4333366, at *2 (N.D. Tex. Dec. 1, 2009) (collecting cases).

In reviewing a Rule 12(b)(3) motion, a court must accept as true all well-pleaded facts in the complaint and may also "look at evidence in the record beyond simply those facts alleged in the complaint and its proper attachments." *Lawson*, 527 F. Supp. 3d at 896 (quoting *Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 238 (5th Cir. 2009)). If a court determines that venue is improper, it has discretion to either dismiss the suit or, "if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."' *McClintock v. Sch. Bd. E. Feliciana Par.*, 299 F. App'x 363, 366 (5th Cir. 2008) (quoting 28 U.S.C. § 1406(a)); *Caldwell v. Palmetto State Sav. Bank of S.C.*, 811 F.2d 916, 919 (5th Cir. 1987) ("[A] court has broad discretion in deciding whether to order a transfer" and may do so "upon a motion or sua sponte."). Generally, when dismissing for improper venue, a district court does so without prejudice to re-filing of the suit in the proper forum. *See* Fed. R. Civ. P. 41(b); *Lowery v. Estelle*, 533 F.2d 265, 267 (5th Cir. 1976).

"[D]istrict courts often dismiss rather than transfer under Section 1406(a) if the [plaintiff] reasonably could have foreseen that the forum in which the suit was filed was improper and that similar conduct should be discouraged." 14D Richard D. Freer,

*Federal Practice and Procedure: Jurisdiction and Related Matters* § 3827 (4th ed. 2023) (collecting cases). This is so because "the interest of justice is not served by allowing a plaintiff [who] committed an obvious error in filing the . . . action in the wrong court, and thereby imposed substantial unnecessary costs on both the defendant and the judicial system, simply to transfer his/her action to the proper court, with no cost to him/herself or his/her attorney." *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1201 (4th Cir. 1993).

## C.  Rule 12(b)(6) Pleading Standard

The Court should grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) if the complaint fails to allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010). "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Sullivan*, 600 F.3d at 546 (cleaned up). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In assessing the complaint, the Court accepts only "well-pleaded facts as true" and disregards "conclusory allegations, unwarranted factual inferences, [and] legal conclusions." *Singh v. RadioShack Corp.*, 882 F.3d 137, 144 (5th Cir. 2018) (internal quotations and citations omitted).

## D.  Qualified Immunity from *Bivens* Liability

The federal Defendants invoke qualified immunity as a defense to Castro's *Bivens* claims. "An action alleging that a federal government actor committed constitutional

violations must be brought under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*." *Doe v. Robertson*, 751 F.3d 383, 387 (5th Cir. 2014). Because federal courts do not recognize the "doctrine of respondeat superior in *Bivens* actions," federal officials may be held liable only for their "personal involvement in the acts causing the deprivation of a person's constitutional rights." *Cronn v. Buffington*, 150 F.3d 538, 544 (5th Cir. 1998); *Iqbal*, 556 U.S. at 675–76.

Moreover, federal officials are "entitled to qualified immunity . . . 'unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'" *Robertson*, 751 F.3d at 387 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Because forcing federal officials to defend private lawsuits diverts "official energy from pressing public issues," *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982), the qualified-immunity doctrine provides "*immunity from suit* rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (explaining qualified immunity "is effectively lost if a case is erroneously permitted to go to trial").

"The doctrine of qualified immunity protects government officials . . . [if] their actions could reasonably have been believed to be legal" and "'all but the plainly incompetent or those who knowingly violate the law.'" *Morgan v. Swanson*, 659 F.3d 359, 370-71 (5th Cir. 2011) (en banc) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). So courts within the Fifth Circuit should "not deny immunity unless 'existing precedent . . . placed the statutory or constitutional question *beyond debate*.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Under Fifth Circuit precedent, "'[e]valuating qualified immunity'" asserted in a motion to dismiss "'is a two-step process,'" and the "'burden is on the plaintiff to prove that a government official is not entitled to qualified immunity.'" *Robertson*, 751 F.3d at

387 (quoting *Wyatt v. Fletcher*, 718 F.3d 496, 502 (5th Cir. 2013)). "First, the plaintiff must allege 'a violation of a clearly established constitutional or statutory right,'" meaning "'existing precedent [has] placed the statutory or constitutional question *beyond debate*.'" *Id.* (quoting *Morgan*, 659 F.3d at 371). Second, the plaintiff must establish that the alleged conduct was "objectively unreasonable in light of the law that was clearly established at the time." *Alexander v. City of Round Rock*, 854 F.3d 298, 303 (5th Cir. 2017) (quotation omitted). Federal courts "have discretion to decide which prong of the qualified-immunity analysis to address first," *Morgan*, 659 F.3d at 371 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)), and "may rely on either prong of the defense in [their] analysis," *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

Whether a federal official's actions were "objectively reasonable" at step two "is a question of law for the court, not a matter of fact for the jury." *Id.* "The unlawfulness of the defendant's actions must have been readily apparent from sufficiently similar situations . . . . In essence, a plaintiff must allege facts sufficient to demonstrate that no reasonable officer could have believed his actions were proper." *Id.*

### III. ARGUMENT AND AUTHORITIES

Because none of the federal Defendants are domiciled in Texas and none of the events alleged in the complaint occurred in Texas, the Court should dismiss the case for lack of personal jurisdiction and improper venue. If the Court reaches the merits of the case, the Court should decline to extend a *Bivens* remedy to this new context and dismiss Castro's claims against the federal Defendants with prejudice. Alternatively, all seven federal Defendants assert and should be granted qualified immunity.

### A. The Court should dismiss the case for lack of personal jurisdiction.

Exercising personal jurisdiction is proper only if "the forum state's long-arm

statute extends to the nonresident defendant and the exercise of jurisdiction comports with due process." *Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 193 (5th Cir. 2019). Because the Texas long-arm statute "reach[es] as far as the federal Constitution permits," *Gundle Lining Constr. Corp. v. Adams Cnty. Asphalt, Inc.*, 85 F.3d 201, 204 (5th Cir. 1996) (citing *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990)), the two-step inquiry "collapses into one federal due process analysis." *See Bulkley & Assocs., L.L.C. v. Dep't of Indus. Relations*, 1 F.4th 346, 351 (5th Cir. 2021). The Fourteenth Amendment's Due Process Clause prohibits the exercise of jurisdiction over a defendant unless the defendant has "such 'contacts' with the forum State that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'" *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945)).

The Supreme Court has "recogniz[ed] two kinds of personal jurisdiction: general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." *Ford Motor Co.*, 141 S. Ct. at 1024 (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915, 919 (2011)). Courts may exercise general jurisdiction, extending to "any and all claims," only when a defendant is "essentially at home" in the forum state. *Goodyear*, 564 U.S. at 919. For an individual, general jurisdiction may be exercised only in the state of their domicile. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). On the other hand, specific jurisdiction may attach to "defendants less intimately connected with a State, but only as to a narrower class of claims." *Ford Motor Co.*, 141 S. Ct. at 1024. To establish specific personal jurisdiction, "there must be an affiliation between the forum and the underlying controversy,

principally, [an] activity or an occurrence that takes place in the forum State," and the defendant must take some action to "purposefully avail[ ] itself of the privilege of conducting activities within the forum State." *Id*. at 1024–25 (internal quotation marks and citations omitted).

### 1. None of the federal Defendants are domiciled in Texas.

The Court cannot exercise general jurisdiction over any of the federal Defendants. The complaint alleges that the federal Defendants reside in California, Florida, and Colorado, and the issued summonses confirm that no Defendant resides in Texas. Compl. ¶¶ 2–9; *see also* ECF No. 4.

### 2. The federal Defendants' alleged actions in the underlying controversy create no connections to Texas.

Unless the federal Defendants' alleged actions related to the underlying controversy occurred in Texas, specific jurisdiction cannot be exercised. Castro has alleged that (1) the grand-jury subpoenas were issued out of the U.S. District Court for the Middle District of Florida, (2) the conspiracy began in Florida, (3) and the investigating agents are or were in Florida. Compl. ¶¶ 47–51, 53, 79. Every action giving rise to Castro's claims took place outside Texas. In fact, Texas is never mentioned in the allegations pertaining to the issued grand-jury subpoenas. *See, e.g.*, *id*. ¶¶ 1, 33, 53, 66, 80, 87, 89, 106 (mentioning Texas in the context of Castro's residency, Castro's unrelated political activity, the scope of the attorney–client privilege, the residency of one of Castro's independent contractors, and separate suits filed in the Northern District of Texas). Accordingly, this Court lacks personal jurisdiction over the federal Defendants, and the claims against the federal Defendants should be dismissed.

## B. The Court should dismiss the case for improper venue.

Venue is proper in the Northern District only if all defendants reside in Texas and

one of those defendants also resides in this district. *See* 28 U.S.C. § 1391(b)(1). Alternatively, and since this case does not involve property located in this district, venue is proper only if a substantial part of the events giving rise to Plaintiff's claim occurred within the judicial district. *See,* 28 U.S.C. § 1391(b)(2).[7]

### 1. Venue is improper because the Defendants do not reside in Texas.

As alleged in his Complaint, Plaintiff's named defendants are: (1) former President Donald J. Trump, a resident of Palm Beach, Florida; (2) Charles Rettig, a resident of Encino, California; (3) Maria Chapa Lopez, no residency location alleged; (4) Tuan Dang Ma, a resident of Orlando, Florida; (5) Anne Craig-Pena, a resident of Lakewood, Colorado; (6) Anton Pukhalenko, a resident of Tampa, Florida; (7) Estella Wells, a resident of Tampa, Florida; and, (8) John Turnicky, no residency location alleged. Compl. ¶¶ 2–9. In turn, Plaintiff requested summonses for Defendant Trump at a Palm Beach, Florida address; for Defendants Chapa Lopez, Pukhalenko, and Wells at Tampa, Florida addresses; for Defendant Ma at an Orlando, Florida address; for Defendant Rettig at an Encino, California address; and for Defendant Turnicky at a McLean, Virginia address. *See* ECF No. 4. Based on the complaint corroborated by the issued summonses, no defendant resides in Texas, much less within the Northern District of Texas. Thus, venue here is improper under 28 U.S.C. § 1391(b)(1).

### 2. Venue is improper because a substantial part of the events giving rise to Castro's claims did not occur within this judicial district.

Castro has alleged that (1) the grand-jury subpoenas were issued out of the U.S. District Court for the Middle District of Florida, (2) the conspiracy began in Florida, (3) and the investigating agents were located in Florida. Compl. ¶¶ 47–51, 53, 79. Every

---

[7] 28 U.S.C. § 1391(e) does not "govern actions for money damages against federal officers individually." *Stafford v. Briggs*, 444 U.S. 527, 544 (1980). Therefore, this suit that Castro brings under *Bivens* must satisfy either 28 U.S.C. § 1391(b)(1) or § 1391(b)(2).

action giving rise to Castro's claims took place outside the state of Texas. In fact, Texas is never mentioned in the context of the issued grand-jury subpoenas. *See, e.g.*, *id*. ¶¶ 1, 33, 53, 66, 80, 87, 89, 106 (mentioning Texas in the context of Castro's residency, Castro's unrelated political activity, the scope of the attorney–client privilege, the residency of one of Castro's independent contractors, and separate suits filed in the Northern District of Texas). Thus, even if Plaintiff can allege a cognizable claim, any suit on that claim should be brought in Florida.

### 3.    This action should be dismissed, not transferred.

Dismissal without prejudice rather than transfer is warranted because Castro "reasonably could have foreseen that the forum in which the suit was filed was improper" and because his conduct should be discouraged. 14D Freer, *supra*, § 3827; *accord Nichols*, 991 F.2d at 1201 ("[T]he interest of justice is not served by allowing a plaintiff [who] committed an obvious error in filing the . . . action in the wrong court, and thereby imposed substantial unnecessary costs on both the defendant and the judicial system, simply to transfer his/her action to the proper court, with no cost to him/herself . . . ."). Here, Castro has long been on notice that the Northern District of Texas is not the proper venue even though he resides here: after all, courts in this District have transferred several of his or his firm's other cases for these or similar reasons.[8]

### C.    Because the *Bivens* issue is "antecedent" to qualified immunity, the Court should decide the *Bivens* question first.

If federal officers sued individually for alleged constitutional violations assert qualified immunity and a lack of a *Bivens* remedy, then the Court should decide the *Bivens* question first. *Oliva v. Nivar*, 973 F.3d 438, 441 (5th Cir. 2020), *cert. denied*, 141

---

[8] *See supra* note 4.

S. Ct. 2669 (2021). This is so because "'the *Bivens* question' is 'antecedent' to questions of qualified immunity." *Id.* (quoting *Hernandez v. Mesa*, 582 U.S. 548, 553 (2017)).

Here, Castro sues the federal Defendants individually for conduct under color of federal law. Compl. ¶ 163. Castro specifically alleges that the federal Defendants conducted a warrantless search of his email[9] and procured grand-jury subpoenas through deception. *Id*. ¶¶ 52, 53, 81, 82, 164. Because these defendants—being sued individually for actions undertaken under federal law—assert both qualified immunity and the lack of a *Bivens* remedy, the Court should decide the *Bivens* question first.

**D.     The Court should not engage in disfavored judicial activity by extending *Bivens* to this new context.**

The Supreme Court has "made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017). In fact, for the past four decades since *Bivens* itself in 1971, *Davis v. Passman* in 1979, and *Carlson v. Green* in 1980, the Supreme Court has become "far more cautious," *Abbasi*, 582 U.S. at 132, and has "consistently rebuffed requests to add to claims allowed under *Bivens*," *Oliva*, 973 F.3d at 443 (quoting *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020)). Even though these three cases remain good law, *Abbasi*, 582 U.S. at 133–35, the Supreme Court has "gone so far as to observe that if 'the Court's three *Bivens* cases [had] been . . . decided today,' it is doubtful that [it] would have reached the same result," *Hernandez*, 140 S. Ct. at 742–43 (quoting *Abbasi*, 582 U.S. at 134).

Today, "[c]ourts confronting *Bivens* claims generally 'must ask two questions. First, do [the plaintiff's] claims fall into one of the three existing *Bivens* actions? Second, if not, should [the court] recognize a new *Bivens* action here?" *Oliva*, 973 F.3d at 441–42

---

[9] Castro's allegations related to the search of his emails are internally inconsistent. In some instances, he claims that there was no warrant at all, Compl. ¶ 164, and in others, he acknowledges that there may have been a warrant, but that it lacked probable cause, *see id*. ¶ 18.

(quoting *Cantú v. Moody*, 933 F.3d 414, 422 (5th Cir. 2019)). If the answers are "no and no," then the constitutional claims should be dismissed. *Id.* at 442, 444.

This motion first summarizes the two-step *Bivens* framework (*infra* sections 1–2) before analyzing whether Castro's Fourth Amendment claim (*infra* section 4) presents a new *Bivens* context. Sections 4 and 5 analyze the alternative remedies and other special factors counseling hesitation.

### 1. If a plaintiff's claim meaningfully differs from *Bivens*, *Carlson*, or *Davis*, then the claim presents a new *Bivens* context.

Under *Abbasi*, to determine whether a *Bivens* remedy is available, the Court should first assess whether the "claim presents a new *Bivens* context." *Butts v. Martin*, 877 F.3d 571, 587 (5th Cir. 2017). The Supreme Court has held that the "new context" concept is "broad" and has described the "new-context inquiry" as "easily satisfied." *See Oliva*, 973 F.3d at 442. This is so because "'even a modest extension' of the *Bivens* trilogy 'is still an extension.'" *Id.* (quoting *Abbasi*, 582 U.S. at 147).

The Fifth Circuit has emphasized that under *Abbasi*, "[v]irtually" every case outside the limited circumstances of *Bivens*, *Davis*, and *Carlson* presents "a 'new context.'" *Oliva*, 973 F.3d at 442 (citing *Abbasi*, 582 U.S. at 149). The Fifth Circuit now limits *Bivens* claims to the following three circumstances:

> (1) manacling the plaintiff in front of his family in his home and strip-searching him in violation of the Fourth Amendment,

> (2) discrimination on the basis of sex by a congressman against a staff person in violation of the Fifth Amendment; and

> (3) failure to provide medical attention to an asthmatic prisoner in federal custody in violation of the Eighth Amendment.

*Oliva*, 973 F.3d at 442 (citations omitted) (citing *Bivens*, 403 U.S. at 389–90; *Davis v. Passman*, 442 U.S. 228 (1979); *Carlson v. Green*, 446 U.S. 14 (1980)).

Claims that "differ in a meaningful way" from the three Supreme Court cases summarized above present a "new context" under *Abbasi*. *See* 582 U.S. at 139–40. Meaningful differences include:

1. the rank of the officers involved;

2. the constitutional right at issue;

3. the generality or specificity of the official action;

4. the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted;

5. the statutory or other legal mandate under which the officer was operating;

6. the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or

7. the presence of potential special factors that previous *Bivens* cases did not consider.

*Cantú*, 933 F.3d at 423 (quoting *Abbasi*, 582 U.S. at 139–40). A *Bivens* claim may meaningfully differ from the *Bivens* trilogy even if the plaintiff asserts "a claim under the . . . same clause of the same amendment *in the same way*" and even if the "'mechanism of injury was the same mechanism of injury in a previous *Bivens* case.'" *Id.* at 422 (quoting *Abbasi*, 582 U.S. at 138). "Even in a particular case, a court likely cannot predict the 'systemwide' consequences of recognizing a cause of action under *Bivens*. That uncertainty alone is a special factor that forecloses relief." *See Egbert v. Boule*, 596 U.S. 482, 493 (2022) (citing *Abbasi*, 582 U. S. at 137; *Hernández v. Mesa*, 885 F.3d 811, 818 (5th Cir. 2018) (en banc)); *see also Hernández*, 885 F.3d at 818 ("The newness of this

'new context' should alone require dismissal").

### 2. If special factors counsel hesitation or alternative remedies are available, then the Court should not create a *Bivens* remedy.

If the asserted *Bivens* claim presents a "new context," then a *Bivens* remedy is unavailable if:

- "special factors counsel[] hesitation in the absence of affirmative action by Congress," *Butts*, 877 F.3d at 587 (quoting *Abbasi*, 582 U.S. at 143); or

- an "alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages," *Butts*, 877 F.3d at 587–88 (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)).

"[A]ny alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie*, 551 U.S. at 550. Indeed, an alternative process "alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Abbasi*, 582 U.S. at 137. "[W]hen alternative methods of relief are available, a *Bivens* remedy usually is not." *Id.* at 145.

In examining special factors and alternative processes, "separation-of-powers principles are or should be central to the analysis. The question is 'who should decide' whether to provide for a damages remedy, Congress or the courts?" *Abbasi*, 582 U.S. at 135. "The answer most often will be Congress." *Id.* After all, "[i]t is not necessarily a judicial function to establish whole categories of cases in which federal officers must defend against personal liability claims in the complex sphere of litigation, with all of its burdens on some and benefits to others." *Id.* at 136. A court now needs to only identify

"*any* rational reason (even one) to think that *Congress* is better suited to" provide a remedy. *Egbert*, 596 U.S. at 496.

**3.**   ***Egbert* forecloses relief for Castro's First Amendment claims dressed up in Fourth Amendment garb.**

Although Castro styles his claims as arising from Fourth Amendment searches, the crux of the claims are First Amendment retaliation. In his Complaint, Castro alleges the federal Defendants violated his "freedom of speech" by harassing him due to his political activities. *See* Compl. 1, ¶¶ 16–25, 36–38, 42, 61, 69, 84–85, 102. At the heart of his claim is that the harassment through various searches and seizures would not have occurred but for his anti-Trump political activity and speech. *See id*. As such, his claims are better read as seeking compensation for First Amendment retaliation. However, as the Supreme Court unanimously held in *Egbert v. Boule*, "there is no *Bivens* action for First Amendment retaliation." 596 U.S. at 498. Accordingly, the Court should dismiss Castro's claims against the federal Defendants with prejudice.

**4.**   **U.S. Courts of Appeals including the Fifth Circuit have held that a "malicious-prosecution-type claim" presents a new *Bivens* context.**

In *Cantú*, the Fifth Circuit held that "*Bivens* does not provide a vehicle to bring [a] claim" that federal officers "violated the Fourth Amendment by fabricating evidence" and lying "to justify seizing" the plaintiff. 933 F.3d at 421.

The facts in *Cantú* are more similar to the facts of *Bivens* than are Castro's allegations. In *Cantú*, federal officers searched the plaintiff's car, located large quantities of a controlled substance (two kilograms of heroin), and arrested the plaintiff under a warrant allegedly obtained through false affidavit testimony (the plaintiff was later indicted, tried, and acquitted). *Id.* at 417–18. The district court dismissed the plaintiff's *Bivens* claims for alleged violation of the Fourth Amendment, and the Fifth Circuit

affirmed. *Id.* at 418–19, 424. The Fifth Circuit concluded that the plaintiff's Fourth Amendment claims are "[b]y any measure . . . meaningfully different from the Fourth Amendment claim at issue in *Bivens*." *Id.* at 423. The plaintiff did not allege that officers "entered his home without a warrant or violated his rights of privacy." *Id.* Moreover, the plaintiff alleged the federal officers "induced prosecutors to charge him without any basis, which led to unjustified detention." *Id.* Thus, unlike *Bivens* itself, the officers' alleged misconduct "involves intellectual leaps that a textbook forcible seizure never does." *Id.*

In reaching the same conclusion—that a *Bivens* remedy should not be extended to malicious-prosecution-type claims—the Eighth Circuit in *Farah v. Weyker*[10] elaborated on other meaningful differences between the claim in *Bivens* and allegations that a federal officer "exaggerate[ed] and invent[ed] facts" and hid exculpatory evidence in violation of the Fourth Amendment. 926 F.3d 492, 496–97, 503 (8th Cir. 2019) (reversing the district court's decision denying the federal officers' motions to dismiss and instructing the court "on remand to dismiss their *Bivens* claims"). "In *Bivens*, the plaintiff's injuries—'humiliation, embarrassment, and mental suffering'—were directly caused by the officers' conduct." *Id.* at 498–99. By contrast, false statements allegedly "injured the plaintiffs through a series of intervening steps," involving "decisions by independent legal actors—the prosecutors who chose to pursue charges against the plaintiffs, the grand jury that voted to indict them, and the judges and magistrates who approved their continued detention. This indirect mechanism of injury bears little resemblance to the straightforward claims from *Bivens*." *Id.* at 499. The Fourth Circuit reached the same conclusion in *Annappareddy v. Pascale*, in which the plaintiff alleged

---

[10] The Eighth Circuit reached the same conclusion in a companion case a year or so later, *Ahmed v. Weyker*, 984 F.3d 564 (8th Cir. 2020), which is briefly discussed further below.

federal officers falsified "evidence in support of the arrest warrant and original indictment." 996 F.3d 120, 135 (4th Cir. 2021). The Fourth Circuit contrasted "the Fourth Amendment right to be free of unreasonable *warrantless* searches" at issue in *Bivens* with "a seizure conducted *with* a warrant," and concluded "the 'right at issue' . . . . is meaningfully different from the one at issue in *Bivens* itself." *Id.* at 135–36.

The Fourth Circuit also observed that the differences between a malicious-prosecution claim and *Bivens* itself "are especially significant because they mean that proving the claims here would require 'a different type of showing' than did the claims in *Bivens*—one that would pose a greater risk of intruding on the investigatory and prosecutorial functions of the executive branch." *Id.* at 136 (citation omitted) (citing *Ahmed*, 984 F.3d at 569). Specifically, to prevail on such a claim, a plaintiff "would have to establish that the defendants knowingly and intentionally or with reckless disregard for the truth made false statements or omissions in the warrant affidavit, and that those false statements or omissions were material to the magistrate judge's finding of probable cause" and to the "grand jury's probable cause determination." *Id.* at 136. Echoing the Eighth Circuit's concerns in *Ahmed*, the Fourth Circuit observed that "*Bivens* did not require this type of fact-checking and conscience-probing, . . . which can, as the Supreme Court has warned, impose 'substantial costs.'" *Id.* (cleaned up) (quoting *Ahmed*, 984 F.3d at 569).

Overall, as a federal court in Texas observed and as reflected in *Cantú* and in the decisions of the Fourth and Eighth circuits discussed above, there exists a "robust consensus of binding and persuasive authority indicating that . . . fabrication of evidence cases present a new *Bivens* context." *Greenlaw v. Klimek*, No. 4:20-CV-311, 2021 WL 6112784, at *6 (E.D. Tex. Dec. 27, 2021) (collecting cases).

In *Oliva*, the Fifth Circuit reversed a district court for having extended *Bivens* to a Fourth Amendment claim alleging excessive force and unreasonable seizure and rejected the district court's conclusion that the "case does not present a new *Bivens* context." 973 F.3d at 441–42. The Fifth Circuit explained that the "case differs from *Bivens* in several meaningful ways," including that:

- The incident did not occur in the plaintiff's private home,

- The claim did not allege "a warrantless search for narcotics," and

- The officers involved "did not manacle [the plaintiff] in front of his family or strip-search him."

*Id.* at 442–43.

Here, this suit over alleged improprieties in a criminal investigation—one alleged to include grand-jury proceedings and digital surveillance—seeks to litigate far beyond the "common and recurrent sphere of law enforcement" at issue in *Bivens*. *Abbasi*, 582 U.S. at 134; *see also id.* at 140 (*Bivens* novelty can turn on "the extent of judicial guidance as to how an officer should" have behaved; "the statutory or other legal mandate under which the officer was operating;" or "the risk of disruptive intrusion by the Judiciary into the functioning of other branches"); *see Attkisson v. Holder*, 925 F.3d 606, 621(4th Cir. 2019) ("[A] claim based on unlawful electronic surveillance presents wildly different facts and a vastly different statutory framework from a warrantless search and arrest[.]"); *Klayman v. Nat'l Sec. Agency*, 280 F. Supp. 3d 39, 58 n.14 (D.D.C. 2017) (*Abbasi* "makes it unclear whether plaintiffs could even maintain a *Bivens* action against them" for alleged illegal surveillance), *aff'd sub nom., Klayman v. Obama,* 759 F. App'x 1 (D.C. Cir. 2019); *Brunoehler v. Tarwater*, 743 F. App'x 740, 743 (9th Cir. 2018)

("declin[ing] to extend *Bivens* in this context" of wiretapping).

Applying these cases, Castro's Fourth Amendment claim presents a new *Bivens* context. Even if the Fifth Circuit's decision in *Cantú* were the only relevant precedent, that decision alone would still bind this Court to reach that result. Castro essentially alleges that the federal Defendants deceived the grand jury to justify the issuance of a subpoena in violation of the Fourth Amendment. *Compare Cantú*, 933 F.3d at 421 (describing plaintiff's complaint as alleging that federal officers "lied to justify seizing him"), *with* Compl. ¶ 52 (alleging that Defendant Ma "pushed for the acquisition of the subpoena through deception"). "*Bivens* does not provide a vehicle to bring that claim." *Cantú*, 933 F.3d at 421. This is so because such a claim "differs from *Bivens* in several meaningful ways," *see Oliva*, 973 F.3d at 442–43, including:

- The alleged misconduct did not occur in Castro's private home, *see id.*;

- The constitutional right at issue is meaningfully different than *Bivens*: Castro was not subject to a warrantless seizure, *see Annappareddy*, 996 F.3d at 135–36 (contrasting *Bivens* with "a seizure conducted *with* a warrant"); *Abbasi*, 582 U.S. at 140;

- The officers involved "did not manacle [the plaintiff] in front of his family or strip-search him," *see Oliva*, 973 F.3d at 443;

- The indirect mechanism of injury—alleged lies to prosecutors and grand jurors, which then led to subpoenas for Castro's records, and then in turn the supposedly illegal search—"bears little resemblance to the straightforward claims from *Bivens*," *see Farah*, 926 F.3d at 499;

- Castro's claim thus "involves intellectual leaps that a textbook forcible seizure never does," *see Cantú*, 933 F.3d at 423;

- Castro's claims would involve "'a different type of showing' than did the claims in *Bivens*," requiring the kind of "fact-checking and conscience-probing" that "the Supreme Court has warned" can "impose 'substantial costs,'" *see Annappareddy*, 996 F.3d at 136 (cleaned up) (quoting *Ahmed*, 984 F.3d at 869); and

- Castro's claims "involve different conduct by different officers from [] different agenc[ies]," *see Cantú*, 933 F.3d at 432, and "seeks to hold accountable a new category of defendants: federal prosecutors," *see Greenlaw*, 2021 WL 6112784, at *6.

"These differences are especially significant" because allowing Castro's *Bivens* claim to proceed could lead to discovery seeking to peer behind prosecutorial, judicial, and typically secret grand-juror deliberations, which "would pose a greater risk of intruding on the investigatory and prosecutorial functions of the executive branch" than the claim in *Bivens* itself. *See id.* Thus, Castro's claim presents a much greater "risk of disruptive intrusion by the Judiciary into the functioning of other branches" than *Bivens*. *See Abbasi*, 582 U.S. at 140 (citing "the risk of disruptive intrusion by the Judiciary into the functioning of other branches" as an example of a meaningful difference).

Because Castro's fabrication-of-evidence malicious-prosecution-type claims meaningfully differ from *Bivens*, his Fourth Amendment claims present a new context.

### 5.  Alternative remedies "alone" preclude a new *Bivens* remedy.

"The second question is whether" the Court "should engage in the 'disfavored judicial activity'" of recognizing a new *Bivens* action." *Cantú*, 933 F.3d at 423. "Again," the Fifth Circuit's decision in *Cantú* prescribes that this Court's answer on the second question should also be "no." *Id.* ("Again, no," reasoning "[o]ne" special factor, among others, counseling hesitation is an existing "statutory scheme for torts committed by federal officers."). Moreover, if "alternative methods of relief are available" to address

injuries of the sort the plaintiff has allegedly suffered, "a *Bivens* remedy usually is not." *Abbasi*, 582 U.S. at 145. Indeed, an alternative process "*alone* may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.* at 137 (emphasis added).

### a. The federal criminal justice system provides remedies.

In this case, Castro alleges that he was injured by the subpoenas, and eventual searches of his records, procured through deception. Congress has crafted myriad alternative methods to address this sort of injury—that is, to deter, protect against, and "compensate individuals who suffer as a result of" the false statements of federal officials and other misconduct "in the course of criminal prosecutions."[11] *See Annappareddy*, 996 F.3d at 137.

As a first line of defense and through the Rules Enabling Act and congressional oversight, Congress established and oversees the federal criminal justice system governed by (among other rules) the Federal Rules of Criminal Procedure. The Federal Rules provide robust procedural safeguards. Indeed, it is hard to imagine a better procedural safeguard against lying than subjecting witnesses to adversarial cross-examination by counsel before a neutral decisionmaker, as guaranteed by the Federal Rules and as would eventually occur if an indictment is issued. *See, e.g.*, *Davis v. Alaska*, 415 U.S. 308, 316 (1974) ("Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.").

"Congress . . . has [also] created a distinct and limited set of remedies to compensate individuals" for the kinds of injuries suffered because of dishonest federal officers. *See Annappareddy*, 996 F.3d at 137 (citing *Farah*, 926 F.3d at 501). A variety of statutes reflect Congress's deliberate choices concerning the remedies available to

---

[11] Castro claims that he is the target of a federal grand-jury investigation, Compl. ¶ 105, and federal grand juries are only used in criminal investigations. *See* Fed. R. Crim. P. 6.

criminal defendants wrongly accused, detained, or convicted. For example, under the so-called Hyde Amendment, Congress has provided for monetary compensation of "a reasonable attorney's fee and other litigation expenses" if the defendant prevails and "the position of the United States was vexatious, frivolous or in bad faith." Pub. L. No. 105-119 (codified at 18 U.S.C. § 3006A); *accord Farah*, 926 F.3d at 501.

The grand-jury process also serves as an independent check on the dangers posed by an allegedly overzealous prosecutor. Compl. ¶¶ 52, 69–70 (alleging then-U.S. Attorney Maria Chapa Lopez's involvement in acquiring an unlawful subpoena); *see United States v. Cotton*, 535 U.S. 625, 634 (2002) (A "grand jury . . . acts as a check on prosecutorial power."); *Powers v. Ohio*, 499 U.S. 400, 411 (1991) ("The jury acts as a vital check against the wrongful exercise of power by the State and its prosecutors."); *United States v. Williams*, 504 U.S. 36, 47 (1992) (describing the grand jury as "a kind of buffer or referee"). Indictments issue only pursuant to twelve grand jurors' independent finding that an "adequate basis" exists "for bringing a criminal charge." *Williams*, 504 U.S. at 51; *see also* Fed. R. Crim. P. 6(f); *DeCamp v. Douglas Cnty. Franklin Grand Jury*, 978 F.2d 1047, 1054 (8th Cir. 1992) ("The grand jury itself serves as a judicial check because it may reject the prosecutors' input."). The grand jury also "controls . . . significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision to charge a capital crime." *Campbell v. Louisiana*, 523 U.S. 392, 399 (1998) (citing *Vasquez v. Hillery*, 474 U.S. 254, 263 (1986)). Castro cannot be tried without a grand-jury indictment (unless he waives prosecution by indictment), *see* Fed. R. Crim. P. 7(a)(1)(B),[12] and under the Federal Rules of Criminal Procedure, he may move to dismiss an indictment for a number of

---

[12] *See also* Fed. R. Crim P. 7(b) (providing that the accused "may be prosecuted by information if the [fully informed] defendant . . . waives prosecution by indictment" in open court).

reasons. *See* Fed. R. Crim. P. 12. If Castro is indicted, he will ultimately be guaranteed a speedy trial by jury. *See* 18 U.S.C. § 3161(a); U.S. Const. amend. VII.

Even safeguards *not* included in the grand-jury process demonstrate the dangers of implying a *Bivens* remedy. "[T]he Fourth Amendment exclusionary rule does not apply to grand jury proceedings." *United States v. R. Enters., Inc.*, 498 U.S. 292, 298 (1991) (citing *United States v. Calandra,* 414 U.S. 338, 349–50 (1974)). The Supreme Court reasoned that "[p]ermitting witnesses to invoke the exclusionary rule would delay and disrupt grand jury proceedings by requiring adversary hearings on peripheral matters, and would effectively transform such proceedings into preliminary trials on the merits." *R. Enters., Inc.*, 498 U.S. at 298 (internal quotations and citations omitted). The Court valued the efficiency and secrecy of the grand jury such that it found allowing mere hearings to exclude illegally obtained evidence under a well-established constitutional rule too burdensome; surely the Court would not approve of implying a new *Bivens* remedy whereby targets of an investigation could pursue an entire court case in parallel.

      **b.**    **Congress has created an adequate remedial scheme for claims specifically arising out of the tax arena.**

Courts have long rejected *Bivens* remedies in the tax arena, given the alternative processes and causes of action already available. *See, e.g.*, *Adams v. Johnson*, 355 F.3d 1179, 1184–85 (9th Cir. 2004); *Wages v. Internal Revenue Serv.*, 915 F.2d 1230, 1235 (9th Cir. 1990). For example, if Castro's dealings with the IRS ultimately lead to "any collection of Federal tax" that "recklessly or intentionally, or by reason of negligence" violated the Internal Revenue Code, he could pursue a private right of action under 26 U.S.C. § 7433—an exclusive remedy that Congress fashioned *solely* against the United States. The Internal Revenue Code, 26 U.S.C. § 7433, provides a remedy for unauthorized collection activities and consents the United States to suit where IRS

employees or agents recklessly or intentionally disregard certain procedures or regulations. *Connor v. Matthews*, 134 F. Supp. 2d 797, 800 (N.D. Tex. 2001).

Through 26 U.S.C. § 7802, Congress established an Oversight Board within the Department of Treasury "to ensure" (among other things) "the proper treatment of taxpayers by the employees of the Internal Revenue Service." 26 U.S.C. § 7802(d)(5). Through 26 U.S.C. § 7213(a)(1), Congress penalizes any officer or employee of the United States who violates 26 U.S.C. § 6103 by unlawfully disclosing taxpayer information.[13] Congress has also provided a damages remedy for the unauthorized inspection or disclosure by an IRS officer or employee of any return or return information, 26 U.S.C. § 7431; the knowing failure by an IRS officer or employee to release a tax lien, 26 U.S.C. § 7432; the intentional disregard of the Internal Revenue Code in the collection of a federal tax or for violating certain bankruptcy procedures, 26 U.S.C. § 7433; and for the intentional compromise of the determination or collection of a tax due from an attorney, CPA, or enrolled agent representing a taxpayer, 26 U.S.C. § 7435. Indeed, Castro himself has already availed himself (albeit unsuccessfully) of sections 6103 and 7431 through a federal lawsuit dismissed earlier this year by Judge O'Connor. *See Castro*, 2023 WL 4444980, at *2.

These statutes show that Congress not only knows how to redress damages for malfeasance by IRS employees, but that it has presumptively limited any redress to the remedies Congress statutorily deemed appropriate. Indeed, numerous U.S. courts of appeals have held that Congress's extensive action to protect taxpayers against overzealous IRS agents preclude a *Bivens* remedy. *See, e.g.*, *Adams*, 355 F.3d at 1185 ("There are few statutory schemes more complex, comprehensive, or subject to greater

---

[13] The officer or employee also faces termination.

congressional scrutiny than the Internal Revenue Code. . . . Congress has given taxpayers all sorts of rights against an overzealous officialdom. . . . Because the Internal Revenue Code gives taxpayers meaningful protections against government transgressions in tax assessment and collection, we hold that *Bivens* relief is unavailable for plaintiffs' suit against IRS auditors and officials."); *see also Dahn v. United States*, 127 F.3d 1249, 1254 (10th Cir. 1997) ("[I]n light of the comprehensive administrative scheme created by Congress to resolve tax-related disputes, individual agents of the IRS are also not subject to *Bivens* actions."); *Vennes v. An Unknown No. of Unidentified Agents of U.S.*, 26 F.3d 1448, 1454 (8th Cir. 1994) ("Congress has provided specific and meaningful remedies for taxpayers who challenge overzealous tax assessment and collection activities. . . . Thus, the district court correctly dismissed Vennes's *Bivens* claims against IRS agents . . . ."). "These carefully crafted legislative remedies confirm that, in the politically sensitive realm of taxation, Congress's refusal to permit unrestricted damage actions by taxpayers has not been inadvertent." *Vennes*, 26 F.3d at 1454.

<blockquote>
<strong>c.     Congress has created a comprehensive scheme to regulate electronic surveillance and redress violations.</strong>
</blockquote>

Castro accuses the federal Defendants of engaging in "rogue, unsanctioned, and unauthorized electronic surveillance" and "push[ing] for the acquisition of the subpoena[s]" related to his electronic records "through deception." Compl. ¶¶ 23, 52. Even if Castro has standing to challenge these subpoenas, he (or, alternatively, the entity who was subpoenaed) could have moved to quash. *Amobi v. D.C. Dep't of Corrections*, 257 F.R.D. 8, 10 (D.D.C. 2009); *see also, e.g.*, *Shvartser v. Lekser*, No. CV 16-1199 (JDB), 2017 WL 8944907, at *2 (D.D.C. July 5, 2017). Extensive legislation addresses the sort of warrantless "surveillance" Castro alleges so broadly. *See*, *e.g.*, *Page v. Comey*, 628 F. Supp. 3d 103 (D.D.C. 2022) (providing comprehensive analysis of statutory

claims arising out of allegedly illegal electronic surveillance); 4 B.E. Witkin, *Witkin: California Criminal Law* § 419 (4th ed. Supp. 2018) (collecting "noteworthy" examples of "federal legislation related to surveillance" dating as far back as the "Communications Act of 1934"). The Wiretap Act covers both appropriate procedures for authorizing interception of communications and the relief available to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used" in an unlawful manner. 18 U.S.C. § 2520(a); *see also id.* § 2520(b) (authorizing equitable and declaratory relief as well as money damages and fees).[14] This "separate, comprehensive remedial process" renders a *Bivens* remedy unwarranted in cases over intercepted communications. *See Kelley v. Fed. Bureau of Investigation*, 67 F. Supp. 3d 240, 271–72 (D.D.C. 2014) ("Any harms to the interests protected by the Fourth Amendment that would arise from the government's unlawful search and seizure of emails would . . . be redressible [sic].") (citing 18 U.S.C. §§ 2703(a)–(b), 2712(a), 2707(a)–(b)); *Brunoehler*, 743 F. App'x at 742–43 (affirming dismissal of *Bivens* claim over allegedly intercepted telephone calls because the Wiretap Act provided "alternative remedies" even if plaintiff "lacked standing to challenge the wiretaps at issue").

To the extent Castro's allegations relate to international communications,[15] his claims implicate legislation governing surveillance related to international investigations. The Foreign Intelligence Surveillance Act ("as amended by the PATRIOT" and "USA

---

[14] With the Electronic Communications Privacy Act (also called the "Stored Communications Act"), Congress expanded these protections to keep pace with technological advances. *See* 18 U.S.C. § 2707(b) (providing relief for interception of stored communications); *id.* § 2511(5)(a)(1)(A) (allowing equitable and money damages relief for victims of unauthorized interceptions of scrambled satellite transmissions); *id.* §§ 2511, 2701 (imposing criminal penalties for unlawful surveillance).

[15] Castro claims that a number of federal actors at the JDFPG, a location in Australia, engaged in unauthorized electronic surveillance of Castro. Compl. ¶¶ 22–23.

FREEDOM Acts") permits "the government to conduct physical searches, electronic surveillance, and wiretaps of residences and offices" when gathering information about "foreign powers" and "agents of foreign powers." *Mayfield v. United States*, 599 F.3d 964, 968 (9th Cir. 2010); *see* 50 U.S.C. §§ 1804, 1823. This statutory scheme imposes criminal penalties and entitles an "aggrieved person" to sue for civil damages. 50 U.S.C. §§ 1089, 1810; *see, e.g.*, *Al-Haramain Islamic Found., Inc. v. Obama*, 705 F.3d 845, 855 (9th Cir. 2012) (dismissing FISA claim against then-FBI Director Mueller). In sum, while it remains entirely unclear how or under what circumstances Castro believes any federal agent engaged in digital surveillance, alternative remedies preclude a *Bivens* remedy to address alleged violations of this nature. *See Attkisson*, 925 F.3d at 621 (in refusing to imply a remedy, "not[ing] that Congress has legislated extensively in the area of electronic surveillance and intrusions into electronic devices without authorizing damages for a Fourth Amendment violation in such circumstances").

### d. Congress has created generalized remedies for torts and misconduct by federal actors.

Moreover, through the Federal Tort Claims Act (FTCA), Congress has established "a statutory scheme for torts committed by federal officers." *Cantú*, 933 F.3d at 423. And although the potential availability of an FTCA claim may not "standing alone—preclude a *Bivens* action," *Greenlaw*, 2021 WL 6112784, at *7 (citing *Carlson*, 446 U.S. at 23), the Fifth Circuit has more recently "emphasized" that the FTCA's existing "statutory scheme for torts committed by federal officers weighs against inferring a new cause of action," *Oliva*, 973 F.3d at 443–44 (cleaned up).

Finally, the gravamen of Castro's complaint is that the federal Defendants allegedly lied under penalty of perjury to procure the subpoenas at issue. Congress's statutory penalties for perjury, *see, e.g.*, 18 U.S.C. § 1621 (prescribing that those found

"guilty of perjury . . . shall . . . be fined . . . or imprisoned not more than five years, or both"), themselves provide yet another alternative remedy and deterrent for the conduct alleged.

In light of the complex "existing remedial structure[s]," the Court should be "especially reluctant to supplement those remedies with [its] own," which provides "'a convincing reason' not to extend *Bivens*" to this new context. *See Ahmed*, 984 F.3d at 571 (quoting *Abbasi*, 582 U.S. at 137).[16]

### 6. Other special factors counsel against a new *Bivens* remedy.

As in *Cantú*, "legion 'special factors'" counsel against "recognizing a new *Bivens* action" here. *See* 933 F.3d at 423. For instance, the Fifth Circuit has recognized that "the length of time Congress has gone without statutorily creating a *Bivens*-type remedy" in a specific context is a special factor counseling hesitation. *Id.* For the more than four decades since the Supreme Court last recognized a new *Bivens* action in *Carlson*, 446 U.S. 14, "Congress has long been on notice that the Supreme Court is disinclined to extend *Bivens* to new contexts," suggesting that Congress's silence is the result of "'more than mere oversight,'" *Cantú*, 933 F.3d at 423–24 (quoting *Abbasi*, 582 U.S. at 143).

"Second, the separation of powers is itself a special factor," *see Oliva*, 973 F.3d at 444, as is "the risk of burdening and interfering with the executive branch's investigative and prosecutorial functions," *Farah*, 926 F.3d at 500; *accord Ahmed*, 984 F.3d at 570. Recognizing a *Bivens* remedy for Castro's Fourth Amendment claims "would require courts to interfere with the executive branch's investigative and prosecutorial functions."

---

[16] Although Castro complains of the inadequacies of available remedies such as IRS and DOJ grievance procedures as well as his inability to otherwise receive compensation, Compl. ¶¶ 152–60, the remedies discussed above are sufficient to foreclose relief under *Bivens*. *See Egbert*, 596 U.S. at 497–98 ("But we have never held that a *Bivens* alternative must afford rights to participation or appeal. That is so because *Bivens* is concerned solely with deterring the unconstitutional acts of individual officers—*i.e.*, the focus is whether the Government has put in place safeguards to prevent constitutional violations from recurring.") (internal quotations and citations omitted).

*See Annappareddy*, 996 F.3d at 137 (citing *Abbasi*, 582 U.S. at 143). For instance, for Castro to prevail, he would need to prove that the federal Defendants' allegedly material omission led the grand jury to issue the subpoena for the allegedly privileged materials. In other words, Castro would need to prove that (1) the investigators believed that Castro's status as a federal practitioner could support an assertion of privilege in a federal criminal investigation,[17] (2) the records would otherwise satisfy the elements of attorney–client privilege, and (3) there was no evidence to support accessing Castro's records under the crime–fraud exception.[18] "This type of showing would invite a wide-ranging inquiry into the evidence available to investigators, prosecutors, and the grand jury," *See Farah*, 926 F.3d at 500, as well as into "what [the] officers knew, what they did not know, and their state of mind," *see Annappareddy*, 996 F.3d at 134 (cleaned up); *United States v. Ortega*, 854 F.3d 818, 826 (5th Cir. 2017) (citations omitted) (describing the *Franks* inquiry as consisting of three questions: "First, does the affidavit contain a false statement? Second, was the false statement made intentionally or with reckless disregard for the truth? And third, if the false statement is excised, does the remaining content in the affidavit fail to establish probable cause?"); *see also Kohler v. Englade*, 470 F.3d 1104, 1113 (5th Cir. 2006) (applying the *Franks* framework to material omissions).

And "such after-the-fact inquiries" pose precisely the sort of "risk of intrusion on executive-branch authority to enforce the law and prosecute crimes, not to mention encroach on the usual secrecy of charging decisions and grand-jury proceedings," that counsels against extending *Bivens*. *See Farah*, 926 F.3d at 501.

---

[17] *See infra* Section E(1).

[18] The only avenue for Castro to contest the subpoena is his assertion of privilege, as probable cause is not required to issue a grand-jury subpoena. *R. Enters., Inc.*, 498 U.S. at 297 ("[T]he Government cannot be required to justify the issuance of a grand jury subpoena by presenting evidence sufficient to establish probable cause because the very purpose of requesting the information is to ascertain whether probable cause exists." (citation omitted)).

Castro asks this Court to abridge prosecutorial discretion constitutionally committed to the Executive Branch, which the Court should not do. "The Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citation and quotations omitted). "[T]he exercise of prosecutorial discretion, at the very core of the executive function, has long been held presumptively unreviewable." *In re Sealed Case No. 97–3025*, 131 F.3d 208, 214 (D.C. Cir. 1997). This deference "stems from a concern not to unnecessarily impair the performance of a core executive constitutional function": "Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy.'" *Armstrong*, 517 U.S. at 465 (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)).

Even in those few instances when judicial scrutiny of prosecutorial discretion might be warranted, more than bald allegations of bad motive are needed to trigger review. *See Hartman v. Moore*, 547 U.S. 250, 263 (2006) (The "presumption that a prosecutor has legitimate grounds for the action he takes is one we do not lightly discard, given our position that judicial intrusion into executive discretion of such high order should be minimal[.]") (citing *Wayte*, 470 U.S. at 607–08); *Crawford-El v. Britton*, 523 U.S. 574, 584–585 (1998) ("Because an official's state of mind is easy to allege and hard to disprove, insubstantial claims that turn on [retaliatory] intent may be less amenable to summary disposition.") (internal quotation marks omitted). And except in those rare instances in which prosecutorial discretion transgresses a constitutional line, separation-of-powers principles leave no role for judicial supervision of the course of investigations.

*See Armstrong*, 517 U.S. at 464. Many investigative targets have little to lose and a potential strategic advantage—such as discovery unavailable in a pending criminal proceeding—to gain by suing. *See Degen v. United States*, 517 U.S. 820, 825–26 (1996) (contrasting the "limited discovery" available in criminal cases with the broader rules applicable in civil cases); *R. Enters., Inc.*, 498 U.S. at 299 ("Requiring the Government to explain in too much detail the particular reasons underlying a subpoena threatens to compromise the indispensable secrecy of grand jury proceedings. Broad disclosure also affords the targets of investigation far more information about the grand jury's internal workings than the Federal Rules of Criminal Procedure appear to contemplate.") (internal quotations and citation omitted).

In sum, implying a *Bivens* remedy to this new context would invite burdensome litigation of little public utility: "suits filed for no other purpose than to harass and interfere with the" grand-jury process or "as a means to gain leverage in the target's criminal proceedings." *McQueen v. United States*, 5 F. Supp. 2d 473, 484 n.20 (S.D. Tex. 1998); *see also DeCamp*, 978 F.2d at 1054 ("[D]isgruntled litigants, upset with the grand jury but unable to sue the grand jurors, may vent their wrath on the prosecutors[.]").

\* \* \*

For all the reasons discussed above, no *Bivens* remedy should be extended to this new context. Castro proposes a new *Bivens* remedy—not for a warrantless search or seizure in his home—to challenge the justification for a grand-jury subpoena obtained as part of an ongoing criminal investigation in which he is a subject. *See* Compl. ¶ 105. This is as bad an idea as it sounds at first blush. *See Wilkie*, 551 U.S. at 561 & n.11 (warning that a "*Bivens* cure" can be "worse than the disease"); *cf. Blair v. United States*, 250 U.S. 273, 282 (1919) (witnesses may not "set limits to the [grand jury] investigation");

*Gerstein v. Pugh*, 420 U.S. 103, 119 (1975) ("[T]he accused is" not "entitled to judicial oversight or review of the decision to prosecute."). Implying a new *Bivens* remedy would subject federal prosecutors and agents to the "'substantial costs' associated with requiring public officials to litigate these types of issues, including 'the diversion' of public resources and deterring 'able citizens from . . . public office'" that the Supreme Court has repeatedly warned against. *See Ahmed*, 984 F.3d at 570–71 (quoting *Harlow*, 457 U.S. at 816). "It may well be that the costs are worth it, but Congress is better equipped than" the judiciary is "to make the call." *See id.* at 571.

**E.      The Court should grant the federal Defendants qualified immunity.**

Even if the Court were to assume Castro's Fourth Amendment unlawful-search and seizure claims were viable under *Bivens*, each federal Defendant would be entitled to qualified immunity. The Fourth Amendment prohibits "unreasonable searches and seizures" and provides that "no warrants shall issue, but upon probable cause." U.S. Const. amend. IV. Reasonableness does not require perfection, rather, "what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable." *Illinois v. Rodriguez*, 497 U.S. 177, 185–86 (1990).

As explained below, each federal Defendant should be granted qualified immunity because (1) Castro has not sufficiently alleged that the federal Defendants were personally involved in violating the Constitution and (2) liability for omissions related to the possibility of privilege when seeking a subpoena was not clearly established.

1. **Castro has not sufficiently alleged that the federal Defendants were personally involved in violating the Constitution.**

    a. **Charles Rettig, Maria Chapa Lopez, Anne Craig-Pena, Anton Pukhalenko, Estela Wells, and John Turnicky did not personally participate in the alleged constitutional violation.**

Castro does not plausibly allege that Charles Rettig, Maria Chapa Lopez, Anne Craig-Pena, Anton Pukhalenko, Estela Wells, or John Turnicky were personally involved in procuring the subpoenas that supposedly violated Castro's constitutional rights. Castro appears to seek to recover from each federal Defendant vicariously for the alleged conduct of Defendant Ma in procuring a subpoena by deception.

As an initial matter, "vicarious liability is inapplicable to *Bivens* . . . suits," meaning Castro "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. "[R]equiring a plaintiff to identify how '*each* defendant, through the official's *own individual actions*, has violated the Constitution,'" ensures "that the serious burdens of defending against this sort of lawsuit are visited upon a . . . supervisor only when the complaint 'plausibly suggest[s]' that the supervisor engaged in 'his or her *own* misconduct.'" *Evans v. Chalmers*, 703 F.3d 636, 661 (4th Cir. 2012) (Wilkinson, J., concurring) (quoting *Iqbal*, 556 U.S. at 679, 681) (emphasis added). Even in the context of covert digital surveillance, allegations against a group of defendants, collectively, will not carry the day.[19] *See, e.g., Neptune v. Carey*, No. CV1712057BRMLHG, 2019 WL 913156, at *4 (D.N.J. Feb. 25, 2019) (rejecting "allegation of unlawful surveillance" that

---

[19] *See, e.g., S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015) ("The doctrine of qualified immunity requires an *individualized* analysis of *each* officer's alleged conduct.") (citation and quotation omitted); *Marcilis v. Township of Redford*, 693 F.3d 589, 596–97 (6th Cir. 2012) ("categorical references to 'Defendants'" do not "allege, with particularity, facts that demonstrate what each defendant did to violate the asserted constitutional right.") (citation and quotation omitted); *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (rejecting a complaint using "either the collective term 'Defendants' or a list of the defendants named individually but with no distinction as to what acts are attributable to whom"); *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) ("By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, [the plaintiff's] complaint failed to satisfy [the] minimum standard.").

failed to specify "how Carey was involved"); *Whitaker v. Barksdale Air Force Base*, No. CIV.A. 14-2342, 2015 WL 574697, at *9 (W.D. La. Feb. 11, 2015) (Plaintiff who "d[id] not state which of the[] officials conducted the surveillance, who intruded upon her home, who installed any of the surveillance devices, or any fact to raise the expectation that further litigation and discovery could possibly reveal illegal conduct" failed to carry her burden.).

The facts as alleged do not plausibly suggest that any of the other federal Defendants personally reviewed Defendant Ma's submissions to the grand jury or "encouraged [Ma] to make misstatements or omit exculpatory evidence." *See Phillips v. Whittington*, No. 20-30731, 2022 WL 797418, at *9 (5th Cir. Mar. 15, 2022); *McDonald v. McClelland*, 779 F. App'x 222, 227 (5th Cir. 2019) ("Bystander liability cannot attach if the officer did not know about and acquiesce in the constitutional violation.")

When analyzed individually, each federal Defendant's conduct cannot reach the level of personal participation required to overcome qualified immunity. First, Defendant Anne Craig-Pena is only mentioned once in the entire body of the complaint. Castro refers to her as "a Trump-supporting IRS Attorney with the Office of Chief Counsel, a U.S. citizen and resident of the city of Lakewood, county of Jefferson, state of Colorado." Compl. ¶ 6. Castro does not allege that she played any role in the searches of his records, and Craig-Pena cannot be held liable merely for supporting former President Trump. Therefore, Craig-Pena is entitled to qualified immunity.

Second, Defendant Anton Pukhalenko played no role in the alleged searches of Castro's records. Castro describes Pukhalenko as "a Trump-supporting Tax Examiner with the Internal Revenue Service" who may have "unlawfully backdated an Information

Document Request" (IDR).[20] *Id*. ¶¶ 7, 50. Castro filed a complaint against Pukhalenko with the IRS. *Id*. ¶ 51. These allegations do not relate to Castro's Fourth Amendment causes of action, and Pukhalenko is therefore entitled to qualified immunity.

Third, Defendant Estela Wells is described as "a Trump-supporting Tax Examiner with the Internal Revenue Service" who "unjustifiably demanded additional documentation in contravention of established regulations and in violation of the Administrative Procedures Act." *Id*. ¶¶ 8, 47. In response, Castro emailed Wells that her actions violated IRS regulations. *Id*. ¶ 48. Wells also allegedly replaced a fellow agent on an examination of one of Castro's clients. *Id*. ¶ 49. Again, Castro does not relate these demands for additional documents or her examination of his client to the searches of his emails or the issuance of grand-jury subpoenas. Therefore, Wells did not commit any alleged Fourth Amendment violation and is entitled to qualified immunity.

Next, Defendant Maria Chapa Lopez is "the former Trump-appointed U.S. Attorney for the Middle District of Florida" who "[t]hen-President [] Trump ordered" to "issue the subpoena" to Georgetown University for Castro's educational records "without the standard and typical gag order." *Id*. ¶ 69. Lopez allegedly authorized the subpoena. *Id*. ¶ 70. Although Castro's allegations related to Lopez touch upon a subpoena, it is *not* the subpoenas that he advances as the basis of his Fourth Amendment claims. *See id*. ¶¶ 162–78 (describing Castro's claims as based on warrantless search of his emails, the Microsoft subpoena, the SmartVault subpoena, and the Wolters Kluwer subpoena). Lopez's alleged actions are not related to any of Castro's claims, and she is therefore

---

[20] "An IDR is a written request for information, books, and records, issued at the beginning of an IRS examination." *Veg Corp, Inc. v. United States*, No. 217CV02893JCMNJK, 2018 WL 3620497, at *1 (D. Nev. July 30, 2018). They are issued to facilitate tax examinations and to obtain information related to a taxpayer's tax liability. *Id.* It is an administrative form and not a summons. *Robert S. v. United States*, No. 16-CV-310-WMC, 2016 WL 7046851, at *2 (W.D. Wis. Dec. 2, 2016).

entitled to qualified immunity.

Fifth, Defendant John Turnicky is described as "the former Head of Security for the Central Intelligence Agency and current Housing Program Manager for the U.S. Department of Defense" at JDFPG. *Id*. ¶ 9. Former President Trump allegedly approached Turnicky "to continue his political harassment" of Castro. *Id*. ¶ 21. Turnicky and other individuals at JDFPG allegedly "abused their access to government spying systems to engage in the unauthorized electronic surveillance of" Castro. *Id*. ¶ 22. This electronic surveillance included monitoring Castro's communications with JDFPG employees regarding tax matters, "Castro's communications with non-JDFPG clients, personal communications, cell phone calls, text messages, home internet activity, and home internet cameras." *Id*. ¶ 24. Turnicky and other unnamed individuals also coordinated with IRS Criminal Investigation to refer Castro to the U.S. Department of Justice. ¶ 25.

Before analyzing Turnicky's personal participation, the Court should disregard Castro's "mere conclusory statements" and "naked assertions devoid of further factual enhancements." *Iqbal*, 556 U.S. at 678 (internal citations and quotations omitted). Nor is the Court "bound to accept as true a legal conclusion couched as a factual allegation." *Id*. (internal citations and quotations omitted). The allegation that Turnicky engaged in unauthorized electronic surveillance is wholly conclusory. Castro does not allege what systems Turnicky used to access Castro's records, what the authorization process for use of these surveillance entails, or how Turnicky would have access to surveillance systems as a Housing Program Manager. In fact, the only reason Castro believes he was surveilled is because the IRS coincidentally reinstated his Enrolled Agent license after he began conducting research on FOIA provisions. *See* Compl. ¶¶ 63–64. Moreover, Castro's

claim that any surveillance was "unauthorized" is "a legal conclusion couched as a factual allegation."[21] *Iqbal*, 556 U.S. at 678 (internal citations and quotations omitted). In assessing Turnicky's qualified-immunity defense, these statements should not be considered. *Id*. at 680–81 (disregarding certain allegations as "not entitled to the assumption of truth" before considering the defendants' qualified immunity defense). As such, Castro's claims amount to nothing more than "an unadorned, the-defendant-unlawfully-harmed me accusation," and this Court must "not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id*. at 678–79. The only remaining factual content asserted in relation to Turnicky is the allegation that he referred Castro to the Department of Justice. A referral to a fellow federal agency does not suffice to establish a violation of the Fourth Amendment, and accordingly, Turnicky is entitled to qualified immunity.

Finally, Defendant Charles Rettig "is the former Trump-appointed Commissioner of Internal Revenue" who allegedly participated in a scheme to request multiple subpoenas on fraudulent grounds and provided false information in a probable cause affidavit. Compl. ¶¶ 3, 16–19, 52. Rettig also allegedly ordered agents to demand additional documentation in some of Castro's tax matters as a harassment tool. *Id*. ¶ 47.

The same principles outlined in *Iqbal* as discussed in relation to Turnicky are applicable here. Castro's allegations that Rettig participated in an unlawful scheme are wholly conclusory. *Compare* Compl. ¶¶ 16–19 (Rettig acted as a political chess piece to weaponize the IRS, the unlawful behavior was directed through Rettig, Rettig identified IRS agents who supported Trump to enlist them for his scheme, and agents at the

---

[21] Furthermore, the allegation that the surveillance was unauthorized is not entitled to the presumption of truth when Castro has inconsistently claimed in some instances that there was no warrant at all, Compl. ¶ 164, and in others, he acknowledges that there may have been a warrant but that it lacked probable cause, *see id*. ¶ 18.

direction of Rettig provided false information in probable cause affidavits),[22] *with Iqbal*,

556 U.S. at 680–81 (disregarding allegations that Attorney General Ashcroft was the

"principal architect" of a discriminatory policy, that FBI Director Mueller was

"instrumental" in executing it, and that both officials knew of and agreed to subject Iqbal

to harsh confinement conditions on account of his race or religion with no legitimate

penological interest). "As between [the] 'obvious alternative explanation'" for the

searches—that there was in fact a legitimate investigatory purpose to the subpoenas—and

the conspiratorial scheme Castro "asks [the Court] to infer," the conspiratorial scheme "is

not a plausible conclusion." *Iqbal*, 556 U.S. at 682. Furthermore, as discussed above, a

respondeat superior theory of liability cannot overcome qualified immunity. The only

remaining factual content relate to Rettig's actions in an unrelated tax matter. Rettig's

demands for additional documentation from Castro's client do not amount to a Fourth

Amendment violation, and accordingly, Rettig is entitled to qualified immunity.

  **b.**  **Castro has not sufficiently alleged a constitutional violation.**

  First, although Castro alleges omissions in the applications for subpoenas and

search warrants, he fails to properly apply the *Franks* framework to determine whether

the application would survive without the excised information. The *Franks* "inquiry

effectively consists of three questions, all of which must be met." *Ortega*, 854 F.3d at

826 (citations omitted). "First, does the affidavit contain a false statement? Second, was

the false statement made intentionally or with reckless disregard for the truth? And third,

if the false statement is excised, does the remaining content in the affidavit fail to

establish probable cause?" *Id.* (citations omitted); *see also Kohler*, 470 F.3d at 1113

(applying the *Franks* inquiry to material omissions). Castro's complaint does not engage

---

[22] As discussed previously, the allegations related to the lack of probable cause affidavit or inclusion of false statements are not entitled to the presumption of truth. *Supra* n.17.

in any way with what facts establishing probable cause were alleged in the original warrant or subpoena applications, how he could prove that the federal Defendants would be aware of the supposedly privileged nature of his documents to prove intentionality,[23] or what facts would remain after excising the false information.

Second, Castro's claims that his records were privileged hinges, mistakenly, on his invocation of state law. Castro cites *In re Silver* for the proposition that his records are protected by the attorney–client privilege under Texas law. 540 S.W.3d 530 (Tex. 2018). However, Castro has alleged that he is the subject of a federal criminal investigation. Compl. ¶¶ 77, 86, 105; *see also Castro v. United States*, No. 4:22-CV-00016-O-BP, 2023 WL 4444980 (N.D. Tex. Mar. 29, 2023), *R&R adopted*, 2023 WL 3848386 (N.D. Tex. June 6, 2023). As such, Castro's assertions of privilege are governed by the federal common law. *See United States v. Gillock*, 445 U.S. 360, 368 (1980) ("Rule 501 requires the application of federal privilege law in criminal cases brought in federal court.); *In re Grand Jury Proc.*, 517 F.2d 666, 669–70 (5th Cir. 1975) (The "federal common law of criminal evidence . . . govern[s] over state law in matters of evidence, which includes privileges."); Fed. R. Evid. 501 (allowing privilege assertions to be determined by state law in civil cases arising out of state law, but otherwise reserving the determination of privilege through the development of federal common law). Moreover, the Fifth Circuit has held that "in the area of federal income tax investigation, the question of privilege is a matter of federal, not state law." *United States v. Finley*, 434 F.2d 596, 597 (5th Cir. 1970) (citing *Colton v. United States*, 306 F.2d 633 (2nd Cir. 1962); *Falsone v. United States*, 205 F.2d 734 (5th Cir. 1953)). Regardless of how the scope of the investigation is defined, Castro cannot rely on *Silver* to assert that his records are privileged.

---

[23] *See infra*, discussing why Castro's claims of privilege fail.

To the contrary, the federal regulations that Castro cites as authorizing him to practice law without a state bar license explicitly limit the privilege to civil tax proceedings. In 1998, Congress passed legislation creating a privilege of confidentiality for communication "between a taxpayer and any federally authorized tax practitioner to the extent the communication would be considered privileged if it were between a taxpayer and an attorney." 26 U.S.C. § 7525 (a)(1). However, Congress explicitly limited this privilege to "noncriminal tax matter[s] before the Internal Revenue Service," *id*. (a)(2)(A), and "noncriminal tax proceeding[s] in Federal court brought by or against the United States," *id*. (a)(2)(B). Castro alleges that the investigation is criminal in nature, *see* Compl. ¶ 105, and therefore he cannot claim a privilege only available in civil tax proceedings to support his Fourth Amendment claims.[24]

Third, even if Texas law were applicable during a federal investigation, *Silver* does not stand for the proposition Castro asserts. Castro claims that *Silver* extended the attorney–client privilege to all federal practitioners. *See* Compl. ¶¶ 53, 80. However, his interpretation stretches *Silver* far beyond its holding. The court in *Silver* held that "a client's communications with his registered patent agent, made to facilitate the agent's provision of authorized legal services to the client, are privileged under [Texas] Rule [of Evidence] 503." 540 S.W.3d at 532. Rule 503's definition of lawyer requires two elements to be met: engagement in the practice of law and authorization. *Id*. at 535. The

---

[24] Moreover, the tax practitioner privilege does not apply to "communications regarding the preparation of tax returns," *United States v. Burga*, No. 18CV01633BLFSVK, 2019 WL 3859157, at *5 (N.D. Cal. Aug. 16, 2019) (internal quotations and citations omitted), or documents that would otherwise be covered by the work-product doctrine, *United States v. KPMG LLP*, 237 F. Supp. 2d 35, 39 (D.D.C. 2002)(citing *United States v. Frederick*, 182 F.3d 496, 502 (7th Cir.1999)). Castro does not allege the contents of the accessed records, but it is possible that many of the records accessed would either not be communications to clients, or would have been regarding the preparation of clients' tax return, and therefore not subject to the statutory privilege. *See* Compl. ¶¶ 81–82 (alleging that subpoenas to SmartVault and Wolters Kluwer sought data files of his tax firm clients and the filings using Wolters Kluwer's software respectively).

court cited patent agents' extensive activities such as preparing patent applications, representing clients in various matters before the United States Patent and Trademark Office (USPTO), and advising clients on the best mechanisms to advance their interests to conclude that patent agents engage in the practice of law. Notably, the court in *Silver* did *not* state all persons representing clients in front of federal agencies practice law. *See generally id*. Rather, the Court conducted a detailed analysis to determine that patent agents "perform the same services and are subject to the same rules and requirements as patent attorneys" in cases before the USPTO. *See id*. at 532, 536 (discussing the role of patent agents in prosecuting patents for clients in front of the United States Patent and Trademark Office (USPTO), the requirement to pass the same exam as a patent attorney, and their ability to provide all the same services as attorneys). Castro has not shown that his activities as a tax preparer mirror the intensive qualifications, responsibilities, and abilities of a patent agent. *Compare* Compl. ¶¶ 28–29, *with Silver*, 540 S.W.3d at 532, 535–36. While the Texas Supreme Court may eventually use similar reasoning to extend the attorney–client privilege to federal tax practitioners, *Silver* does not go so far.

Fourth, even assuming that Castro can invoke the Texas attorney–client privilege as a tax preparer to defeat or limit a grand-jury subpoena, his bald assertions of privilege are conclusory statements that do not rise to the level of a well-pleaded allegation. Castro provides the following allegations in support of his assertion "that the emails being sought were protected by the Texas Attorney–client privilege": (1) Castro is a federal tax practitioner, (2) the Texas Supreme Court expanded the attorney–client privilege to apply to federal practitioners, and (3) his emails contained a notice that they contained privileged material. Compl. ¶¶ 28, 53, 80. Notably, he does not allege the presence of any of the privilege's elements: "(1) a confidential communication; (2) made for the purpose

of facilitating the rendition of professional legal services; (3) between or amongst the client, lawyer, and their representatives; and (4) the privilege has not been waived." Tex. R. Evid. 503(b); *Huie v. DeShazo,* 922 S.W.2d 920, 923 (Tex. 1996). Castro does not claim that the emails were exchanged between him and a client, that others were not copied or did not otherwise have access to the communications, or that the emails facilitated tax preparation as opposed to some personal purpose. A boilerplate email disclaimer standing alone is not sufficient to establish privilege from a grand-jury subpoena. As such, Castro's claims of privilege fail, and he has not plausibly alleged that the federal Defendants violated the Constitution.

Lastly, even if the records were privileged, that does not necessarily mean that a Fourth Amendment violation occurred. "[T]he attorney–client privilege constitutes an evidentiary privilege that is secured by state law, and not by the Constitution or laws of the United States. As a creature of state law, the attorney–client privilege cannot be asserted as a basis for recovery under § 1983." *Bradt v. Smith,* 634 F.2d 796, 800 (5th Cir. 1981) (citations omitted); *see also United States v. Squillacote,* 221 F.3d 542, 560 (4th Cir 2000) (holding that the psychotherapist–patient privilege "is a testimonial or evidentiary one, and not constitutionally-based," and that evidence derived from an electronic interception of therapist-patient conversations did not therefore have to be suppressed); *United States v. Lefkowitz,* 618 F2d 1313, 1318 n.8 (9th Cir 1980) ("Because we reject [the] argument that the marital privileges are somehow constitutionally grounded in . . . the Fourth Amendment, we doubt that a secondary source of information obtained through information protected by the confidential marital communications privilege would in any way be 'tainted.'"). A *Bivens* action against a federal official may arise only from a violation of the Constitution. Therefore, just as the

Court in *Bradt* held that the state attorney–client privilege cannot sustain an action under federal law for section 1983, the violation of a state attorney–client privilege in this case cannot sustain an implied damages action under the Constitution.[25]

Because Castro has failed to apply the proper Fourth Amendment framework and his assertions of privilege fail under both federal and state law, the Court should grant the federal Defendants' motion to dismiss Castro's Fourth Amendment claims.

### 2. Liability for subpoenaing privileged records in Castro's peculiar circumstances was not clearly established.

On the clearly-established-law prong of qualified immunity, the Fifth Circuit has repeatedly reiterated that to overcome a qualified-immunity defense, "the plaintiff must identify a [then-existing] case in which an officer acting under similar circumstances was held to have violated the Constitution and explain why the case clearly proscribed the conduct of that individual officer." *Cope v. Cogdill*, 3 F.4th 198, 205 (5th Cir. 2021) (cleaned up). "Broad general propositions are not enough to overcome qualified immunity." *Id.* And by "case," the Fifth Circuit has made clear that means "controlling authority" (i.e., the Supreme Court or Fifth Circuit) or "a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Wyatt*, 718 F.3d at 503. "[U]nless existing precedent squarely governs the conduct at issue, an official will be entitled to qualified immunity." *Cope*, 3 F.4th at 204.

In May 2019, no Supreme Court or Fifth Circuit case had yet addressed the issue

---

[25] To the extent that intrusions on the attorney–client privilege could violate the Constitution, it is questionable that the Fourth Amendment would be a proper vehicle to advance that claim. *See Weatherford v. Bursey*, 429 U.S. 545, 558 (1977) (holding that governmental intrusion into the attorney–client privilege is not sufficient by itself to constitute Sixth Amendment violation); *Dye v. Hofbauer*, 197 F. App'x 378, 383 (6th Cir. 2006) (commenting that "government interference with a defendant's relationship with his counsel may constitute a Sixth Amendment violation," but holding that it had not occurred in that case). The Supreme Court has only permitted *Bivens* actions in limited contexts to vindicate Fourth, Fifth, and Eighth Amendment rights, and would likely decline to engage in "judicially disfavored activity" to allow claims in the Sixth Amendment context. *Hernandez*, 140 S. Ct. at 742–43 (cleaned up).

of a federal agent omitting the privileged nature of documents sought in a grand-jury subpoena—let alone clearly established that a federal employee or official in the same or similar circumstances as the federal Defendants as alleged here violates the Fourth Amendment. On the contrary, no case deals with (1) the alleged omission of potential privilege by a federal agent in obtaining a grand-jury subpoena, (2) the contours of privilege for documents held by an unlicensed individual practicing law under an IRS Preparer Tax Identification Number in the context of a federal criminal investigation, or (3) intrusions on the attorney–client privilege to establish a Fourth Amendment violation.

Because "the law did not put the officer[s] on notice that [their] conduct would be clearly unlawful," "qualified immunity is appropriate" for all federal Defendants. *See Saucier v. Katz*, 533 U.S. 194, 195 (2001).

## IV.    CONCLUSION

Castro has sued the federal Defendants in a court that lacks personal jurisdiction or proper venue. For these reasons alone, this case should be dismissed. Moreover, Castro asks the Court to create a *Bivens* remedy in a new context where "legion 'special factors'" counsel against "recognizing a new *Bivens* action." *See Cantú* 933 F.3d at 423. The Court should not engage in "disfavored judicial activity" and instead should dismiss Castro's constitutional claims with prejudice. *See Abbasi*, 582 U.S. at 135. Even if the Court were to assume a *Bivens* remedy would be available, all roads lead to qualified immunity. Therefore, the Court should grant the federal Defendants' motion to dismiss and enter judgment in their favor that Castro take nothing.

Dated: November 13, 2023

Respectfully submitted,

LEIGHA SIMONTON
UNITED STATES ATTORNEY

By: */s/ Najib H. Gazi*
George M. Padis
    Texas Bar No. 24088173
Najib H. Gazi
    Texas Bar No. 24131329
Assistant United States Attorneys
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
214.659.8600
Fax: 214.659.8811
george.padis@usdoj.gov
najib.gazi@usdoj.gov

*Attorneys for Defendants Charles Rettig,*
*Maria Chapa Lopez, Tuan Ma, Anne Craig-*
*Pena, Anton Pukhalenko, Estela Wells, and*
*John Turnicky*

## CERTIFICATE OF SERVICE

On November 13, 2023, I electronically filed the above motion with the clerk of court for the U.S. District Court, Northern District of Texas. I certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Najib H. Gazi*
Najib H. Gazi